## WAINWRIGHT, SECRETARY, FLORIDA DEPART-MENT OF CORRECTIONS v. WITT

No. 83–1427.   Argued October 2, 1984—Decided January 21, 1985

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 436. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 439.

*Robert J. Landry*, Assistant Attorney General of Florida, argued the cause for petitioner. With him on the briefs was *Jim Smith*, Attorney General.

*William C. McLain* argued the cause and filed a brief for respondent.*

---

*A brief of *amici curiae* urging reversal was filed for the Texas District and County Attorneys Association et al. by *David Crump, Charles A. Graddick*, Attorney General of Alabama, *Ed Carnes*, Assistant Attorney General, *Robert R. Corbin*, Attorney General of Arizona, *William J. Schafer III*, Assistant Attorney General, *Steve Clark*, Attorney General

JUSTICE REHNQUIST delivered the opinion of the Court.

This case requires us to examine once again the procedures for selection of jurors in criminal trials involving the possible imposition of capital punishment, see *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), and to consider standards for federal courts reviewing those procedures upon petition for a writ of habeas corpus.

I

Respondent Johnny Paul Witt was convicted of first-degree murder in Florida and sentenced to death. The murder was committed while respondent and a friend were bow-and-arrow hunting. The evidence at trial showed that the two had spoken together on other occasions about killing a human, and had even stalked persons as they would stalk animal prey. On the day in question, respondent, then aged 30, and his younger accomplice were hunting in a wooded area near a trail often used by children. When the victim, an 11-year-old boy, rode by on his bicycle, respondent's accomplice hit the child on the head with a star bit from a drill. Respondent and his accomplice then gagged the stunned victim, placed him in the trunk of respondent's car, and drove to a deserted grove. Upon opening the trunk, the conspirators discovered that the victim had died by suffocating from the gag. The two committed various sexual and violent acts on the body, then dug a grave and buried it.

of Arkansas, *Victra L. Fewell*, Assistant Attorney General, *John K. Van de Kamp*, Attorney General of California, *Edward P. O'Brian*, Assistant Attorney General, *Austin J. McGuigan*, Chief State's Attorney of Connecticut, *John M. Massameno*, Assistant State's Attorney, *Edwin Lloyd Pittman*, Attorney General of Mississippi, *William S. Boyd III*, Assistant Attorney General, *John Ashcroft*, Attorney General of Missouri, *John M. Morris*, Assistant Attorney General, *Michael C. Turpen*, Attorney General of Oklahoma, *Robert W. Cole*, Assistant Attorney General, *David G. Wilkinson*, Attorney General of Utah, and *Earl F. Dorius*, Assistant Attorney General.

Respondent was tried by a jury and convicted of first-degree murder. In accordance with the recommendation of the jury, the trial judge sentenced him to death. On appeal to the Florida Supreme Court respondent raised a number of claims, one of which was that several prospective jurors had been improperly excluded for cause because of their opposition to capital punishment, in violation of this Court's decision in *Witherspoon* v. *Illinois, supra.* The Florida Supreme Court affirmed the conviction and sentence, and this Court denied certiorari. *Witt* v. *State,* 342 So. 2d 497, cert. denied, 434 U. S. 935 (1977). After unsuccessfully petitioning for postconviction review in the state courts, see *Witt* v. *State,* 387 So. 2d 922 (Fla.), cert. denied, 449 U. S. 1067 (1980), respondent filed this petition for a writ of habeas corpus in the United States District Court for the Middle District of Florida, raising numerous constitutional claims. That court denied the petition. On appeal, the Court of Appeals for the Eleventh Circuit reversed and granted the writ. 714 F. 2d 1069 (1983), modified, 723 F. 2d 769 (1984).

The only claim the Eleventh Circuit found meritorious was respondent's *Witherspoon* claim. The court found the following exchange during *voir dire,* between the prosecutor and venireman Colby, to be insufficient to justify Colby's excusal for cause:[1]

> "[Q. Prosecutor:] Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?
> "[A. Colby:] I am afraid personally but not—
> "[Q]: Speak up, please.

---

[1] Respondent argued in the Court of Appeals that 3 of the 11 prospective jurors excused for cause—veniremen Colby, Gehm, and Miller—were improperly excused. The court considered Mrs. Colby's colloquy the *"least certain statement of inability to follow the law as instructed,"* and limited its discussion to her questioning. See 714 F. 2d, at 1081 (emphasis in original). We agree that Mrs. Colby provided the least clear example of a biased venireman, and we therefore need not discuss the *voir dire* of veniremen Gehm and Miller.

"[A]: I am afraid of being a little personal, but definitely not religious.

"[Q]: Now, would that interfere with you sitting as a juror in this case?

"[A]: I am afraid it would.

"[Q]: You are afraid it would?

"[A]: Yes, Sir.

"[Q]: Would it interfere with judging the guilt or innocence of the Defendant in this case?

"[A]: I think so.

"[Q]: You think it would.

"[A]: I think it would.

"[Q]: Your honor, I would move for cause at this point.

"THE COURT: All right. Step down." Tr. 266–267.

Defense counsel did not object or attempt rehabilitation.

In *Witherspoon,* this Court held that the State infringes a capital defendant's right under the Sixth and Fourteenth Amendments to trial by an impartial jury when it excuses for cause all those members of the venire who express conscientious objections to capital punishment. As the Court of Appeals in this case noted, however, the *Witherspoon* Court also recognized the State's legitimate interest in excluding those jurors whose opposition to capital punishment would not allow them to view the proceedings impartially, and who therefore might frustrate administration of a State's death penalty scheme. The Court of Appeals drew the standard for determining when a juror may properly be excluded from *Witherspoon*'s footnote 21; jurors may be excluded for cause if they make it

"unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" 391 U. S., at 522, n. 21 (emphasis in original).

The Court of Appeals construed our decisions to require that jurors expressing objections to the death penalty be given "great leeway" before their expressions justify dismissal for cause. "A prospective juror may even concede that his or her feelings about the death penalty would possibly color an objective determination of the facts of a case without admitting of the necessary partiality to justify excusal." 714 F. 2d, at 1076–1080. The court concluded that the colloquy with venireman Colby reprinted above did not satisfy the *Witherspoon* standard. Colby's limited expressions of "feelings and thoughts" failed to "unequivocally state that she would automatically be unable to apply the death penalty . . . ." *Id.*, at 1082. In part, the court found the ambiguity in the record was caused by the lack of clarity of the prosecutor's questions. The prosecutor's question whether Colby's feelings about the death penalty would "interfere" with her sitting was ambiguous, because the fact of such "interference" failed to satisfy *Witherspoon*'s requirement that she be unable to apply the death sentence under any circumstances. The court found its holding consistent with Circuit precedent applying the *Witherspoon* standard. See *Granviel* v. *Estelle*, 655 F. 2d 673 (CA5 1981); *Burns* v. *Estelle*, 626 F. 2d 396 (CA5 1980).

In a footnote, the Court of Appeals noted its uncertainty over whether a state trial court's finding of bias should be accorded a presumption of correctness under the federal statute governing habeas corpus proceedings, 28 U. S. C. § 2254(d). The court stated, however, that under the circumstances it would reach the same result regardless of the standard of review. 714 F. 2d, at 1083, n. 10. Because this case raises questions on which there is considerable confusion in the lower courts, concerning the degree of deference that a federal habeas court should pay to a state trial judge's determination that a juror may be excused for cause under *Witherspoon*, see *Darden* v. *Wainwright*, 725 F. 2d 1526, 1528–1530 (CA11 1984); *O'Bryan* v. *Estelle*, 714 F. 2d 365

(CA5 1983), cert. denied, 465 U. S. 1013 (1984); *Texas* v. *Mead,* 465 U. S. 1041, 1043 (1984) (REHNQUIST, J., dissenting from denial of certiorari), and because of what seemed to us as more general confusion surrounding the application of *Witherspoon,* we granted certiorari. 466 U. S. 957. We reverse.

## II

*Witherspoon* is best understood in the context of its facts. The case involved the capital sentencing procedures for the State of Illinois. Under the Illinois death sentencing statute, the jury was asked to decide only whether death was "the proper penalty" in a given case. Another Illinois statute provided:

> "In trials for murder it shall be a cause for challenge of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same." *Witherspoon,* 391 U. S., at 512.

Pursuant to this statute, nearly half the veniremen at Witherspoon's trial were excused for cause because they "expressed qualms about capital punishment." *Id.,* at 513. This Court held that under this procedure the jury obtained would not be the impartial jury required by the Sixth Amendment, but rather a jury "uncommonly willing to condemn a man to die." *Id.,* at 521. It concluded that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.,* at 522.

Despite *Witherspoon's* limited holding, later opinions in this Court and the lower courts have referred to the language in footnote 21, or similar language in *Witherspoon's* footnote 9, as setting the standard for judging the proper exclusion of a juror opposed to capital punishment. See, *e. g., Maxwell* v. *Bishop,* 398 U. S. 262, 265 (1970); *Boulden* v. *Holman,* 394

U. S. 478, 482 (1969);[2] *Hackathorn* v. *Decker*, 438 F. 2d 1363, 1366 (CA5 1971); *People* v. *Washington*, 71 Cal. 2d 1061, 1091–1092, 458 P. 2d 479, 496–497 (1969). Later cases in the lower courts state that a venireman may be excluded only if he or she would "automatically" vote against the death penalty, and even then this state of mind must be "unambiguous," or "unmistakably clear." See, *e. g.*, *Burns* v. *Estelle*, *supra*, at 398.

But more recent opinions of this Court demonstrate no ritualistic adherence to a requirement that a prospective juror make it "unmistakably clear . . . that [she] would *automatically* vote against the imposition of capital punishment . . . ." In *Lockett* v. *Ohio*, 438 U. S. 586, 595–596 (1978), prospective capital jurors were asked:

> " '[D]o you feel that you could take an oath to well and truely *[sic]* try this case . . . and follow the law, or is your conviction so strong that you cannot take an oath, knowing that a possibility exists in regard to capital punishment?' "

We held that the veniremen who answered that they could not "take the oath" were properly excluded. Although the *Lockett* opinion alluded to the second half of the footnote 21 standard, dealing with a juror's inability to decide impartially a defendant's guilt, the Court did not refer to the "automatically" language. Instead, it simply determined that each of the excluded veniremen had made it " 'unmistakably clear' that they could not be trusted to 'abide by existing law' and 'to follow conscientiously the instructions' of the trial judge." *Id.*, at 596.

This Court again examined the *Witherspoon* standard in *Adams* v. *Texas*, 448 U. S. 38 (1980). *Adams* involved the

---

[2] *Maxwell* and *Boulden* cited the following language from footnote 9:

"Unless a venireman states *unambiguously* that he would *automatically* vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position." *Maxwell*, 398 U. S., at 265; *Boulden*, 394 U. S., at 482 (emphasis added).

Texas capital sentencing scheme, wherein jurors were asked to answer three specific questions put by the trial judge. The court was required to impose the death sentence if each question was answered affirmatively. A Texas statute provided that a prospective capital juror "'shall be disqualified . . . unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact.'" *Id.*, at 42. Before deciding whether certain jurors had been properly excluded pursuant to this statute, this Court attempted to discern the proper standard for making such a determination. The Court discussed its prior opinions, noting the *Witherspoon* Court's recognition, in footnote 21, that States retained a "legitimate interest in obtaining jurors who could follow their instructions and obey their oaths." 448 U. S., at 44. The Court concluded:

> "This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.* The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Id.*, at 45 (emphasis added).

The Court went on to hold that *as applied in that case* certain veniremen had been improperly excluded under the Texas statute, because their acknowledgment that the possible imposition of the death penalty would or might "affect" their deliberations was meant only to indicate that they would be more emotionally involved or would view their task "with greater seriousness and gravity." *Id.*, at 49.[3] The Court

---

[3] The Court cited the following answer of venireman Jenson, whom the Court found was improperly excluded: "'Well, I think it probably would

reasoned that such an "effect" did not demonstrate that the prospective jurors were unwilling or unable to follow the law or obey their oaths.

The state of this case law leaves trial courts with the difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial. Although this task may be difficult in any event, it is obviously made more difficult by the fact that the standard applied in *Adams* differs markedly from the language of footnote 21. The tests with respect to sentencing and guilt, originally in two prongs, have been merged; the requirement that a juror may be excluded only if he would never vote for the death penalty is now missing; gone too is the extremely high burden of proof. In general, the standard has been simplified.

There is good reason why the *Adams* test is preferable for determining juror exclusion. First, although given *Witherspoon*'s facts a court applying the general principles of *Adams* could have arrived at the "automatically" language of *Witherspoon*'s footnote 21, we do not believe that language can be squared with the duties of present-day capital sentencing juries. In *Witherspoon* the jury was vested with unlimited discretion in choice of sentence. Given this discretion, a juror willing to *consider* the death penalty arguably was able to "follow the law and abide by his oath" in choosing the "proper" sentence. Nothing more was required. Under this understanding the only veniremen who could be deemed excludable were those who would

---

[affect my deliberations] because afterall *[sic]*, you're talking about a man's life here. You definitely don't want to take it lightly.'" 448 U. S., at 50, n. 7. The Court also found other veniremen improperly excluded who had been unable to state whether their views would or would not "affect" their deliberations. *Id.*, at 50.

never vote for the death sentence or who could not impartially judge guilt.

After our decisions in *Furman* v. *Georgia*, 408 U. S. 238 (1972), and *Gregg* v. *Georgia*, 428 U. S. 153 (1976), however, sentencing juries could no longer be invested with such discretion.   As in the State of Texas, many capital sentencing juries are now asked specific questions, often factual, the answers to which will determine whether death is the appropriate penalty.   In such circumstances it does not make sense to require simply that a juror not "automatically" vote against the death penalty; whether or not a venireman *might* vote for death under certain *personal* standards, the State still may properly challenge that venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge.   To hold that *Witherspoon* requires anything more would be to hold, in the name of the Sixth Amendment right to an impartial jury, that a State must allow a venireman to sit despite the fact that he will be unable to view the case impartially.[4]

Second, the statements in the *Witherspoon* footnotes are in any event dicta.   The Court's holding focused only on circumstances under which prospective jurors could *not* be excluded; under *Witherspoon's* facts it was unnecessary to decide when they *could* be.   This Court has on other occasions similarly rejected language from a footnote as "not controlling."   See *McDaniel* v. *Sanchez*, 452 U. S. 130, 141 (1981).

---

[4] For similar reasons the references to "automatic" decisionmaking in both *Maxwell* v. *Bishop*, 398 U. S. 262 (1970), and *Boulden* v. *Holman*, 394 U. S. 478 (1969), also can be discounted.   At the time those cases were decided the death sentencing statutes in Arkansas and Alabama, respectively, apparently allowed juries unlimited discretion in imposing the death sentence.   In addition, both cases involved jurors who were excused merely because they had "conscientious" objections to, or did not "believe in," the death penalty.   *Maxwell, supra,* at 264–265; *Boulden, supra,* at 483–484.

Finally, the *Adams* standard is proper because it is in accord with traditional reasons for excluding jurors and with the circumstances under which such determinations are made. We begin by reiterating *Adams'* acknowledgment that "*Witherspoon* is not a ground for challenging any prospective juror. It is rather a limitation on the State's power to exclude . . . ." *Adams* v. *Texas*, 448 U. S., at 47–48. Exclusion of jurors opposed to capital punishment began with a recognition that certain of those jurors might frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths. *Witherspoon* simply held that the State's power to exclude did not extend beyond its interest in removing those particular jurors. But there is nothing talismanic about juror exclusion under *Witherspoon* merely because it involves capital sentencing juries. *Witherspoon* is not grounded in the Eighth Amendment's prohibition against cruel and unusual punishment, but in the Sixth Amendment. Here, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts. That is what an "impartial" jury consists of, and we do not think, simply because a defendant is being tried for a capital crime, that he is entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor.

As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality. See *Reynolds* v. *United States*, 98 U. S. 145, 157 (1879). It is then the trial judge's duty to determine whether the challenge is proper. This is, of course, the standard and procedure outlined in *Adams*, but it is equally true of any situation where a party seeks to exclude a biased juror. See, *e. g.*, *Patton* v. *Yount*, 467 U. S. 1025, 1036 (1984) (where a criminal defendant sought to excuse a juror for cause and the trial judge refused, the question was simply "did [the] juror swear

that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestations of impartiality have been believed").

We therefore take this opportunity to clarify our decision in *Witherspoon,* and to reaffirm the above-quoted standard from *Adams* as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."[5] We note that, in addition to dispensing with *Witherspoon*'s reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply can-

---

[5] The dissent chides us for our failure to discuss in greater detail the *Witherspoon* case, and apparently seeks to remedy this defect by devoting page after page to its own exegesis of that decision. Much of this exegesis, however, is a latter-day version of a "fair cross section" theme barely adumbrated by that opinion. But even accepting the dissent's latter-day underpinnings for *Witherspoon,* that case represented a necessary balancing of the accused defendant's right to a jury panel drawn from a "fair cross section of the community"—which if carried to its logical conclusion would require that a juror be seated who frankly avowed that he could not and would not follow the judge's instructions on the law—against the traditional right of a party to challenge a juror for bias—which if carried to *its* logical extreme would permit exclusion from jury panels of groups of people whose general philosophical views might have no bearing on their ability to follow a judge's instructions. We adhere to the essential balance struck by the *Witherspoon* decision rendered in 1968, if not to the version of it presented by today's dissent; we simply modify the test stated in *Witherspoon*'s footnote 21 to hold that the State may exclude from capital sentencing juries that "class" of veniremen whose views would prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths.

not be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.[6]   Despite this lack of clarity in the printed record, however, there will be situations where

---

[6] See, for example, the excerpts of the *voir dire* of venireman Pfeffer set out in *O'Bryan* v. *Estelle*, 714 F. 2d 365, 379 (CA5 1983), cert. denied, 465 U. S. 1013 (1984):

" 'THE COURT: Well, the law requires that we have to have a definite answer.

" '[A]: I understand, right.

" 'THE COURT: Because the law does allow people to be excused because of certain beliefs that could be prejudicial or biased for one side or the other, and both sides just want to know if you can keep an open mind, consider the entire full range of punishment, whatever that may be, and under the proper set of circumstances, if they do exist and you feel they exist, that you could return that verdict.   And that's in essence what they're asking.

" '[A]: Indirectly, I guess I would have to say no.

" 'THE COURT: You could not?

" '[A]: I would have to say no then, to give you a yes or no answer.

" 'THE COURT: Then, am I to believe by virtue of that answer that regardless of what the facts would reveal, regardless of how horrible the circumstances may be, that you would automatically vote against the imposition of the death penalty?

" '[A]: As I say, I don't know.

" 'THE COURT: Well, that's the question I have to have a yes or no to.

" '[A]: Right.

" 'THE COURT: And you're the only human being alive who knows, Mr. Pfeffer.

" '[A]: Right, I understand.   If I have to make a choice between yes and no, I would say I couldn't make the judgment.' "

Some period later, juror Pfeffer gave the following answer:

" 'THE COURT: You yourself are in such a frame of mind that regardless of how horrible the facts and circumstances are, that you would automatically vote against the imposition of the death penalty?   Is that correct?

" '[A]: Well, if it says a yes or no, I would have to say yes, I would automatically vote against, to give a correct answer.' "

the trial judge is left with the definite impression that a pro-spective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully *infra*, this is why deference must be paid to the trial judge who sees and hears the juror.

Given this standard, it is clear that the Court of Appeals below erred at least in part; the court focused unduly on the lack of clarity of the questioning of venireman Colby, and on whether her answers indicated that she would "auto-matically" vote against the death penalty. Since there are portions of the Court of Appeals' opinion that suggest that its result could be squared with *Adams*, however, we proceed to discuss another very important question in the administration of *Witherspoon* challenges—the degree of deference that a federal habeas court must pay to a state trial judge's determination of bias.

## III

This case arises from respondent's petition for habeas cor-pus under 28 U. S. C. § 2254, and therefore a federal review-ing court is required to accord any findings of the state courts on "factual issues" a "presumption of correctness" under 28 U. S. C. § 2254(d).[7] Although the District Court relied on

---

[7] Section 2254(d) provides:

"In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

"(1) that the merits of the factual dispute were not resolved in the State court hearing;

"(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

"(3) that the material facts were not adequately developed at the State court hearing;

this section and accorded deference to the state trial judge's finding of bias, *Witt* v. *Wainwright*, No. 80–545–CIV–T–GC (MD Fla., May 14, 1981), the Court of Appeals did not decide whether this finding was subject to the presumption because in its opinion the facts of the case required reversal of the sentence "under even the least rigorous standard of appellate review." 714 F. 2d, at 1083, n. 10. The court did note confusion over whether § 2254(d) applies to a *Witherspoon* finding, however, and subsequently the Eleventh Circuit adopted the position that such a finding was a "mixed question of law and fact" not subject to the section. See *Darden* v. *Wainwright*, 725 F. 2d, at 1528–1530.

This Court has recently decided several cases dealing with the scope of the § 2254(d) presumption. See, *e. g.*, *Patton* v. *Yount*, 467 U. S. 1025 (1984); *Rushen* v. *Spain*, 464 U. S. 114

---

"(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

"(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

"(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

"(7) that the applicant was otherwise denied due process of law in the State court proceeding;

"(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

"And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous."

(1983); *Marshall* v. *Lonberger,* 459 U. S. 422 (1983); *Sumner* v. *Mata,* 455 U. S. 591 (1982) *(Sumner II); Sumner* v. *Mata,* 449 U. S. 539 (1981) *(Sumner I).* These cases have emphasized that state-court findings of fact are to be accorded the presumption of correctness. See *Sumner II, supra,* at 597, n. 10; *Cuyler* v. *Sullivan,* 446 U. S. 335, 342 (1980).[8] Last Term, in *Patton, supra,* we held that a trial judge's finding that a particular venireman was not biased and therefore was properly seated was a finding of fact subject to § 2254(d). We noted that the question whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind. We also noted that such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.[9] Such determinations were entitled to deference even on direct review; "[t]he respect paid such findings in a habeas proceeding certainly should be no less." *Id.,* at 1038.[10]

---

[8] In *Cuyler,* 446 U. S., at 342, this Court held that "mixed determination[s] of law and fact" are not subject to the § 2254(d) presumption.

[9] In *Reynolds* v. *United States,* 98 U. S. 145, 156–157 (1879), this Court stated:

"[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case."

[10] In *O'Bryan* v. *Estelle,* 714 F. 2d, at 392 (Higginbotham, J., concurring specially), Judge Higginbotham artfully discusses those factors, in addition to the trial court's advantage of having seen and heard the juror, which dictate deference to the trial judge's decision under these circumstances. He suggests deference is mandated in general in the interest of finality—to preserve a trial court's integrity as a court of law, instead of as an "entrance gate" for fact collecting subject to appellate review. In addition, he points out that on habeas review, comity and federalism indicate the need to defer to the independent mechanisms of state government that already have reached one decision on the same facts. See also *Darden* v. *Wainwright,* 725 F. 2d 1526, 1551 (CA11 1984) (Fay, J., concurring in part and dissenting in part).

*Patton*'s holding applies equally well to a trial court's determination that a prospective capital sentencing juror was properly excluded for cause. In *Darden* v. *Wainwright, supra,* at 1529, the Court of Appeals for the Eleventh Circuit reached a contrary conclusion because it viewed the exclusion of jurors under *Witherspoon* as a "mixed question of law and fact." But the *Darden* court reached its conclusion because it labored under the misapprehension that the standard for determining exclusion was that found in *Witherspoon*'s footnote 21—which imposed "a strict legal standard" and "a very high standard of proof." 725 F. 2d, at 1528. Given this rather complex law, the court reasoned, a prospective juror's answers would not alone decide the issues; the trial judge must still interpret them in light of the legal standard. Since the trial court's function was application of law to fact, the determination was subject to independent review.

It will not always be easy to separate questions of "fact" from "mixed questions of law and fact" for § 2254(d) purposes, cf. *Patton, supra,* at 1037, n. 12. But it is nevertheless clear, based on the foregoing discussion concerning the standard for exclusion, that reasoning such as that found in *Darden* is destined for the same end as the footnote upon which it is based. Once it is recognized that excluding prospective capital sentencing jurors because of their opposition to capital punishment is no different from excluding jurors for innumerable other reasons which result in bias, *Patton* must control. The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. These are the "factual issues" that are subject to § 2254(d).

In so holding, we in no way denigrate the importance of an impartial jury. We reiterate what this Court stressed in *Dennis* v. *United States,* 339 U. S. 162, 168 (1950): "[T]he trial court has a serious duty to determine the question of actual bias, and a broad discretion in its rulings on challenges

therefor. . . . In exercising its discretion, the trial court must be zealous to protect the rights of an accused."

## IV

Turning to the facts, we conclude that juror Colby was properly excused for cause. Applying the analysis required by § 2254(d), we have already determined that the question of challenge for bias is a "factual issue" covered by the section. Nor does respondent seriously urge that the trial court's decision to excuse juror Colby for bias was not a "determination after a hearing on the merits." Respondent does argue, however, that this conclusion was not "evidenced by a written finding, written opinion, or other reliable and adequate written indicia . . . ." We disagree.

The transcript of the *voir dire* reprinted above shows that juror Colby was questioned in the presence of both counsel and the judge; at the end of the colloquy the prosecution challenged for cause; and the challenge was sustained when the judge asked juror Colby to "step down." Nothing more was required under the circumstances to satisfy the statute. Anyone familiar with trial court practice knows that the court reporter is relied upon to furnish an accurate account of what is said in the courtroom. The trial judge regularly relies upon this transcript as written indicia of various findings and rulings; it is not uncommon for a trial judge to merely make extemporaneous statements of findings from the bench.

Our conclusion is strengthened by a review of available alternatives. We decline to require the judge to write out in a separate memorandum his specific findings on each juror excused. A trial judge's job is difficult enough without senseless make-work. Nor do we think under the circumstances that the judge was required to announce for the record his conclusion that juror Colby was biased, or his reasoning. The finding is evident from the record. See *Marshall* v. *Lonberger*, 459 U. S., at 433. In this regard it is noteworthy that in this case the court was given no reason to think that elaboration was necessary; defense counsel did

not see fit to object to juror Colby's recusal, or to attempt rehabilitation.[11]

The finding of the trial judge is therefore "presumed correct" unless one of the enumerated reasons for avoiding the presumption is present here. Respondent does not suggest that paragraphs 1 through 7 are applicable; he must therefore rest his case on the exception in paragraph 8—that the finding of bias is "not fairly supported" by the record viewed "as a whole." Respondent attacks the record in two ways. First, he notes that venireman Colby was the first juror questioned, and claims that from the record there is no way to determine whether the trial judge applied the correct standard. As we have stated on other occasions, however, where the record does not indicate the standard applied by a state trial judge, he is presumed to have applied the correct one. See *Marshall* v. *Lonberger, supra,* at 433; *LaVallee* v. *Delle Rose,* 410 U. S. 690, 694–695 (1973); *Townsend* v. *Sain,* 372 U. S. 293, 314–315 (1963). Here, in addition, there is every indication that the judge indeed applied the correct standard. Although the judge did not participate in questioning venireman Colby, the record shows that on several subsequent occasions during *voir dire* he did participate in questioning. On each of those occasions the judge asked

---

[11] In so stating, we do not mean to suggest that respondent "waived" his *Witherspoon* claim under *Wainwright* v. *Sykes,* 433 U. S. 72 (1977), by failing to contemporaneously object. There is no doubt that in spite of respondent's failure to object, the Florida courts reached the merits of his *Witherspoon* claim. See *Witt* v. *State,* 342 So. 2d 497 (Fla.), cert. denied, 434 U. S. 935 (1977). Under circumstances where the state courts do not rely on independent state grounds for disposing of a claim and instead reach the merits of a federal question, the federal question is properly before us. See *Ulster County Court* v. *Allen,* 442 U. S. 140, 154 (1979). Nevertheless, counsel's failure to speak in a situation later claimed to be so rife with ambiguity as to constitute constitutional error is a circumstance we feel justified in considering when assessing respondent's claims. We note that since *Witt* was decided by the Florida Supreme Court that court has enforced a contemporaneous-objection rule when dealing with *Witherspoon* challenges. See *Brown* v. *State,* 381 So. 2d 690, 693–694 (1980).

questions entirely consistent with the *Adams* standard.[12]
There is no reason to believe, as respondent seems to suggest, that the judge's understanding of the standard changed between the time of the questioning of Colby and the questioning of the later veniremen.

Respondent's second contention is that the colloquy between the prosecutor and Colby is simply too ambiguous to support the trial court's decision to excuse her. Respondent claims that the ambiguity he sees is due to the prosecutor's use of the word "interfere" in his questioning of Colby; merely because juror Colby affirmed that her views would

---

[12] See, *e. g.*, the questioning of Ms. Kazmierczak:

"THE COURT: Wait a minute, ma'am. I haven't made up my mind yet. Just have a seat. Let me ask you these things. Do you have any prefixed ideas about this case at all?

"[A]: Not at all.

"THE COURT: Will you follow the law that I give you?

"[A]: I could do that.

"THE COURT: What I am concerned about is that you indicated that you have a state of mind that might make you be unable to follow the law of this State.

"[A]: I could not bring back a death penalty.

"THE COURT: Step down." Tr. 341.

and the questioning of Mrs. Hill:

"THE COURT: Well, ma'am, what I am concerned about is whether or not you will render a fair and impartial verdict, whether you have any prefixed ideas about this case, and whether you will follow the law. That's the whole shebang right there.

"[A]: I would give a true verdict. I mean, I wouldn't—I can do that.

"THE COURT: Well, from what you are saying, I have some concern. Will you follow the law in this case?

"[A]: Pardon?

"THE COURT: Will you follow the law in this case?

"[A]: Yes, unless it was that I had to give a death sentence. I couldn't do that." *Id.*, at 372.

Since it is clear that the trial judge applied a standard in accord with our decision today, there is no need to address respondent's contention that the Florida Supreme Court applied the incorrect standard on direct review.

"interfere" with her sitting does not necessarily indicate whether she could in any event have applied the law impartially. Respondent agrees that some jurors might interpret "interfere" to mean "prevent" (the word which is used in the key passage in our *Adams* opinion), but claims that other equally reasonable jurors could understand it to mean "make difficult," "create emotional turmoil," or "impair, but not substantially." As a corollary, respondent suggests that because the posited ambiguity was caused by the question, rather than the answer, there is no reason to defer to the trial judge's finding, since a finding based upon Colby's demeanor would be worthless without a finding that she had a particular understanding of the question. The Court of Appeals agreed with respondent that "[t]he word 'interfere' admits of a great variety of interpretations," and that the colloquy between the prosecutor and Colby did not indicate the extent of the "interference." 714 F. 2d, at 1082.

If we were so brash as to undertake a treatise on synonyms and antonyms, we would agree that the dictionary definitions of "interfere" are not identical with the dictionary definitions of "prevent." But that, of course, is not the question. The fact that a particular verb is used in a key passage of an appellate opinion stating the standard for excusing jurors for cause does not mean that that word, and no other, must be used in all the thousands of subsequent proceedings in which the prosecution challenges jurors for cause. The law is stated in an opinion such as *Adams;* but the question in subsequent cases is whether a trial court finding that the standard was met is "fairly supported" by the "record . . . considered as a whole . . . ." The standard in this case is the easily understood one enunciated in *Adams;* whether the juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 448 U. S., at 45. Relevant *voir dire* questions addressed to this issue need not be framed ex-

clusively in the language of the controlling appellate opinion; the opinion is, after all, an opinion and not an intricate devise in a will.

As we emphasized in *Marshall* v. *Lonberger*, 459 U. S., at 432, the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record. Here we think there is ample support for the trial court's finding that Colby's views would have prevented or substantially impaired the performance of her duties as a juror. On four separate occasions she affirmed that her beliefs would interfere with her sitting as a juror. One common meaning of "interfere" is to "create an obstacle." Respondent argues that in Colby's case, the obstacle was not insurmountable; but the trial court found to the contrary. As we stated in *Marshall* v. *Lonberger, supra,* at 434:

> "As was aptly stated by the New York Court of Appeals, although in a case of rather different substantive nature: 'Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth. . . . How can we say the judge is wrong? We never saw the witnesses. . . . To the sophistication and sagacity of the trial judge the law confides the duty of appraisal.' *Boyd* v. *Boyd*, 252 N. Y. 422, 429, 169 N. E. 632, 634."

Thus, whatever ambiguity respondent may find in this record, we think that the trial court, aided as it undoubtedly was by its assessment of Colby's demeanor, was entitled to resolve it in favor of the State. We note in addition that respondent's counsel chose not to question Colby himself, or to object to the trial court's excusing her for cause. This

questioning might have resolved any perceived ambiguities in the questions; its absence is all the more conspicuous because counsel did object to the trial court's excusing other veniremen later on during the *voir dire*. Indeed, from what appears on the record it seems that at the time Colby was excused no one in the courtroom questioned the fact that her beliefs prevented her from sitting. The reasons for this, although not crystal clear from the printed record, may well have been readily apparent to those viewing Colby as she answered the questions.

Respondent's attempt to separate the answers from the questions misses the mark; the trial court, hopefully imbued with a fair amount of common sense as well as an understanding of the applicable law, views the questioning as a whole. It is free to interrupt questioning to clarify any particular statement. There is nothing in this record which indicates that anybody had trouble understanding the meaning of the questions and answers with respect to Colby. One of the purposes of § 2254(d) was to prevent precisely this kind of parsing of trial court transcripts to create problems on collateral review where none were seen at trial.

The trial court's finding of bias was made under the proper standard, was subject to § 2254(d), and was fairly supported by the record. Since respondent has not adduced "clear and convincing evidence that the factual determination by the State court was erroneous," we reverse the judgment of the Court of Appeals.[18]

*It is so ordered.*

---

[18] Respondent seeks affirmance of the judgment of the Court of Appeals on the alternative ground that the Supreme Court of Florida at the time of his appeal of his conviction was engaged in soliciting and receiving psychiatric, psychological, and other reports concerning the mental condition and backgrounds of individuals sentenced to death which had not been introduced in the trial proceedings. In *Ford* v. *Strickland*, 696 F. 2d 804, 811 (CA11), cert. denied, 464 U. S. 865 (1983), a majority of the Court of

JUSTICE STEVENS, concurring in the judgment.

Because the Court's opinion contains so much discussion that is unnecessary to the resolution of this case, I am unable to join it.[1]  Much of that discussion is inconsistent with the standard announced in *Adams* v. *Texas*, 448 U. S. 38 (1980), which the entire Court continues to endorse today.[2]  The majority, however, does identify the facts that are critical to a proper disposition of this case.[3]

---

Appeals accepted the Supreme Court of Florida's determination that it did not in fact make use of the material in question in its review of capital cases.  We see no reason to disturb this essentially factual determination by the Court of Appeals.

[1] I do agree with the Court's observation that dictum is not binding in future cases.  See *ante*, at 422.

[2] The Court, *ante*, at 423, expressly endorses the following statement in the *Adams* opinion:

"As an initial matter, it is clear beyond a peradventure that *Witherspoon* is not a ground for challenging any prospective juror.  It is rather a limitation on the State's power to exclude: if prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out."  448 U. S., at 47–48.

JUSTICE BRENNAN, in his dissent today, also endorses that standard.  See *post*, at 450 (BRENNAN, J., joined by MARSHALL, J., dissenting).

[3] "Defense counsel did not object or attempt rehabilitation."  *Ante*, at 416.

"In this regard it is noteworthy that in this case the court was given no reason to think that elaboration was necessary; defense counsel did not see fit to object to juror Colby's recusal, or to attempt rehabilitation."  *Ante*, at 430–431.

"Nevertheless, counsel's failure to speak in a situation later claimed to be so rife with ambiguity as to constitute constitutional error is a circumstance we feel justified in considering when assessing respondent's claims.  We note that since *Witt* was decided by the Florida Supreme Court that court has enforced a contemporaneous-objection rule when dealing with *Witherspoon* [v. *Illinois*, 391 U. S. 510 (1968),] challenges.  See *Brown* v. *State*, 381 So. 2d 690, 693–694 (Fla. 1980)."  *Ante*, at 431, n. 11.

"We note in addition that respondent's counsel chose not to question Colby himself, or to object to the trial court's excusing her for cause.  This

Defense counsel did not object to the exclusion of venireman Colby and made no attempt, either by cross-examination or in colloquy with the court, to demonstrate that she could properly serve as a juror, or that defendant wanted her to serve. The entire examination of Colby, who was the first prospective juror to be specifically questioned about her views on the death penalty, consists of the few lines quoted by the Court. *Ante*, at 415–416. The contrast between defense counsel's silence when Colby was excused, and his reaction to the prosecutor's motion to excuse venireman Kazmierczak is illuminating.

After answering several questions of the prosecutor, juror Kazmierczak stated: "I don't think [my views on the death penalty] would interfere with the guilt or innocence of the person, but the decision of what guilt and what the outcome would be for his destiny, I could not go along with the death penalty." Tr. 273. When the prosecutor later moved to excuse her for cause, defense counsel objected, further questioning ensued, and when the trial court expressed concern "that you have a state of mind that might make you unable to follow the law of this State," Kazmierczak unequivocally responded: "I could not bring back a death penalty." *Id.*, at 341. The record thus demonstrates that defense counsel wanted Kazmierczak to serve as a juror, but that she was properly excused.

Defense counsel's objection to the excusing of Kazmierczak, notwithstanding her stronger testimony indicating bias, lends credence to the hypothesis that competent trial counsel could well have made a deliberate decision not to object to the exclusion of Colby because he did not want her

---

questioning might have resolved any perceived ambiguities in the questions; its absence is all the more conspicuous because counsel did object to the trial court's excusing other veniremen later on during the *voir dire*." *Ante*, at 434–435.

to serve as a juror.[4]  Given the gruesome facts of this case, see *ante*, at 414, and Colby's somewhat timorous responses, it is entirely possible that her appearance and demeanor persuaded trial counsel that he would prefer a more vigorous or less reluctant juror.[5]  In view of that possibility, I am unable to conclude that the State's failure to make the kind of record required by *Adams* v. *Texas* constitutes an error so fundamental that it infects the validity of the death sentence in this case.[6]

Accordingly, I concur in the Court's judgment.[7]

---

[4] As I have previously suggested, the absence of an objection at trial sheds important light on the significance of an alleged constitutional error even when it does not create an absolute procedural bar to review.  *Engle* v. *Isaac,* 456 U. S. 107, 136, n. 1 (1982) (STEVENS, J., concurring in part and dissenting in part) ("The failure to object generally indicates that defense counsel felt that the trial error was not critical to his client's case; presumably, therefore, the error did not render the trial fundamentally unfair"); *Wainwright* v. *Sykes,* 433 U. S. 72, 96 (1977) (STEVENS J., concurring) ("The record persuades me that competent trial counsel could well have made a deliberate decision not to object to the admission of the respondent's in-custody statement").

[5] Earlier in the *voir dire,* Colby had been repeatedly admonished to speak louder, Tr. 237–238, and her demeanor in answering several of the prosecutor's questions may have indicated to counsel that it would be inconvenient for her to serve on the jury: "Well, it will cause me to lose my work.  This is all. . . . I have made plans—of course, this is a [holiday] as far as the post office is concerned—so I was off today." *Id.,* at 238.  She added that she could make arrangements to serve on the jury, "if I have to." *Id.,* at 239.

[6] See *Rose* v. *Lundy,* 455 U. S. 509, 544–545 (1982) (STEVENS, J., dissenting).

[7] I should note that the defense counsel also did not object to the exclusion of either venireman Gehm or Miller.  When Gehm was asked whether he could keep an open mind as to whether to vote for the death penalty or life, he responded: "No, I could not." Tr. 296.  The most relevant portion of Miller's examination reads as follows:

"[Q]: And you wouldn't be able to follow the law as instructed by the Court?

"[A]: When it comes down to a death penalty, I wouldn't.

"[Q]: You could not do it.  Okay.  Regardless of the law?

"[A]: No, sir." *Id.,* at 356.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia*, 428 U. S. 153, 227 (1976), I would affirm the judgment of the Court of Appeals for the Eleventh Circuit to the extent it vacates respondent Johnny Paul Witt's sentence of death. Even if I thought otherwise, however, I would vote to affirm the decision below in this case. If the presently prevailing view of the Constitution is to permit the State to exact the awesome punishment of taking a life, then basic justice demands that juries with the power to decide whether a capital defendant lives or dies not be poisoned against the defendant.

The Sixth Amendment jury guarantee "reflect[s] a profound judgment about the way in which law should be enforced and justice administered. . . . Providing an accused with the right to be tried by a jury of his peers [gives] him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." *Duncan* v. *Louisiana*, 391 U. S. 145, 155–156 (1968). In *Witherspoon* v. *Illinois*, 391 U. S. 510, 521 (1968), the Court recognized that the *voir dire* practice of "death qualification"—the exclusion for cause, in capital cases, of jurors opposed to capital punishment—can dangerously erode this "inestimable safeguard" by creating unrepresentative juries "uncommonly willing to condemn a man to die." See also *Adams* v. *Texas*, 448 U. S. 38, 44–45, 48–50 (1980). To protect against this risk, *Witherspoon* and its progeny have required the State to make an exceptionally strong showing that a prospective juror's views about the death penalty will result in actual bias toward the defendant before permitting exclusion of the juror for cause.

The Court of Appeals below correctly applied the stringent *Witherspoon* standards to the *voir dire* colloquy between the prosecutor and prospective juror Colby. Reversing this decision, the Court today abandons *Witherspoon*'s strict

limits on death-qualification and holds instead that death-qualification exclusions be evaluated under the same standards as exclusions for any other cause.[1]  Championing the right of the State to a jury purged of all possibility of partiality toward a capital defendant, the Court today has shown itself willing to ignore what the Court in *Witherspoon* and its progeny thought crucial: the inevitable result of the quest for such purity in the jury room in a capital case is not a neutral jury drawn from a fair cross section of the community but a jury biased against the defendant, at least with respect to penalty,[2] and a jury from which an identifiable segment of the community has been excluded.  Until today it had been constitutionally impermissible for the State to require a defendant to place his life in the hands of such a jury; our fundamental notions of criminal justice were thought to demand that the State, not the defendant, bear the risk of a less than wholly neutral jury when perfect neutrality cannot, as in this situation it most assuredly cannot,[3] be achieved.  Today the State's right to ensure exclusion of any juror who might fail

---

[1] The Court has depicted the lurid details of respondent Witt's crime with the careful skill of a pointillist.  Had the Court been equally diligent in rendering the holding below, it might not have neglected to mention that, as in every case of a violation of *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), only the defendant's death sentence and not his conviction was vacated.  However heinous Witt's crime, the majority's vivid portrait of its gruesome details has no bearing on the issue before us.  It is not for this Court to decide whether Witt deserves to die.  That decision must first be made by a jury of his peers, so long as the jury is impartial and drawn from a fair cross section of the community in conformity with the requirements of the Sixth and Fourteenth Amendments.

[2] *Witherspoon* held that a sentence of death imposed by such a jury violated the Sixth Amendment, but, because the evidence was fragmentary at that time, declined to hold that an underlying conviction by such a jury was also unconstitutionally infirm because the jury would be conviction-prone. *Id.*, at 517–518.  See n. 11, *infra*.

[3] See Gross, Determining the Neutrality of Death-Qualified Juries, 8 Law and Human Behavior 7, 26–28 (1984).

to vote the death penalty when the State's capital punishment scheme permits such a verdict vanquishes the defendant's right to a jury that·assuredly will not impose the death penalty when that penalty would be inappropriate.

## I

### A

Because the Court is not forthright about the extent to which today's decision departs from *Witherspoon* and its progeny, and because the Court does not even acknowledge the constitutional rights *Witherspoon* is meant to protect, a detailed exposition of *Witherspoon* v. *Illinois* is in order.

In the typical case not involving the possibility of a death penalty, the State is given significant leeway to exclude for cause those jurors who indicate that various circumstances might affect their impartiality.[4] Broad exclusion is generally permitted even though some such jurors, if pressed further on *voir dire*, might be discovered to possess the ability to lay aside their prejudices and judge impartially. Although, as we held in *Witherspoon*, exclusion on "any broader basis" than a juror's unambiguously expressed inability to follow instructions and abide by an oath serves no legitimate state interest, 391 U. S., at 522, n. 21, such broader exclusion is typically permitted for the sake of convenience because it disserves no interest of the defendant.

The Court's crucial perception in *Witherspoon* was that such broad exclusion of prospective jurors on the basis of the possible effect of their views about capital punishment infringes the rights of a capital defendant in a way that broad exclusion for indicia of other kinds of bias does not. No systemic skew in the nature of jury composition results from exclusion of individuals for random idiosyncratic traits likely

---

[4] See generally 2 W. Lafave & J. Israel, Criminal Procedure § 21.3 (1984).

to lead to bias. Exclusion of those opposed to capital punishment, by contrast, keeps an identifiable class of people off the jury in capital cases and is likely systemically to bias juries. Such juries are more likely to be hanging juries, tribunals more disposed in any given case to impose a sentence of death. *Id.*, at 523. These juries will be unlikely to represent a fair cross section of the community, and their verdicts will thus be unlikely to reflect fairly the community's judgment whether a particular defendant has been shown beyond a reasonable doubt to be guilty and deserving of death. For a community in which a significant segment opposes capital punishment, "proof beyond a reasonable doubt" in a capital case might be a stricter threshold than "proof beyond a reasonable doubt" in a noncapital case. A jury unlikely to reflect such community views is not a jury that comports with the Sixth Amendment. *Adams* v. *Texas, supra,* at 50. See *Witherspoon,* 391 U. S., at 519–520. Cf. *Peters* v. *Kiff,* 407 U. S. 493, 503–504 (1972) (opinion of MARSHALL, J.) ("It is not necessary to conclude that the excluded group will consistently vote as a class in order to conclude . . . that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance"); *Ballard* v. *United States,* 329 U. S. 187, 193–194 (1946) (discussing "subtle interplay of influence one on the other" among jurors of varying perspectives).

This perception did not, however, lead us to ban all inquiry into a prospective juror's views about capital punishment. We also acknowledged, as the Court today correctly points out, that the State's legitimate interest in an impartial jury encompasses the right to exclude jurors whose views about capital punishment would so distort their judgment that they could not follow the law. *Witherspoon* accommodated both the defendant's constitutionally protected rights and the State's legitimate interests by permitting the State to exclude jurors whose views about capital punishment would

prevent them from being impartial but requiring strict standards of proof for exclusion. In particular, *Witherspoon* precluded any speculative presumption that a juror opposed to capital punishment would for that reason lack the ability to be impartial in a particular case; "[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." *Witherspoon, supra,* at 519. Accord, *Maxwell* v. *Bishop,* 398 U. S. 262, 265 (1970); *Boulden* v. *Holman,* 394 U. S. 478, 483–484 (1969). Beyond prohibiting any presumption of bias, *Witherspoon* imposed, as the Court today recognizes, an "extremely high burden of proof" of actual bias. *Ante,* at 421. The State may exclude only those jurors who make it "unambiguous" or "unmistakably clear," *Witherspoon, supra,* at 515–516, n. 9, 522, n. 21, that their views about capital punishment would prevent or substantially impair them from following the law.[5]

Three important consequences flow from *Witherspoon's* stringent standard for exclusion. First, it permits exclusion only of jurors whose views would prevent or substantially impair them from following instructions or abiding by an oath, and not those whose views would simply make these tasks more psychologically or emotionally difficult, nor those whose views would in good faith color their judgment of what a "reasonable doubt" is in a capital case. *Adams* v. *Texas,* 448 U. S., at 48–51. Second, it precludes exclusion of jurors

---

[5] In *Witherspoon* the Court defined the excludable class as those whose views would "prevent" impartiality. 391 U. S., at 522, n. 21. *Adams* v. *Texas,* 448 U. S. 38 (1980), defined the excludable class as those whose views would prevent or *substantially impair* impartiality. *Id.,* at 45. This variation is not significant; the primary focus of the *Witherspoon* inquiry, as *Adams* made clear, remains on whether the prospective juror can follow instructions and abide by an oath. *Adams, supra,* at 45, 49–50.

whose *voir dire* responses to death-qualification inquiries are ambiguous or vacillating. *Witherspoon, supra,* at 515–516, n. 9, 522, n. 21. Third, it precludes exclusion of jurors who do not know at *voir dire* whether their views about the death penalty will prevent them abiding by their oaths at trial. *Adams, supra,* at 50. See generally Schnapper, Taking *Witherspoon* Seriously: The Search for Death-Qualified Jurors, 62 Texas L. Rev. 977, 981–993 (1984).

These restrictions not only trace narrowly the compass of permissible exclusion but also allocate to the State the cost of unavoidable uncertainty with respect to whether a prospective juror with scruples about capital punishment should be excluded. They do so in much the same way, and for much the same reason, that the "proof beyond a reasonable doubt" standard of guilt allocates to the State the cost of uncertainty with respect to whether a particular defendant committed a crime. See *In re Winship,* 397 U. S. 358, 370–373 (1970) (Harlan, J. concurring). At *voir dire* some prospective jurors may make clear that their opposition to capital punishment will color their judgment but may not make clear whether the effect will rise to the level of "conscious distortion or bias." *Adams* v. *Texas, supra,* at 46. Many others will not bring to the *voir dire* a considered position about capital punishment and thus may respond with uncertainty, ambiguity, evasion, or even self-contradiction during the death-qualification process. When the time for decision arrives such jurors might or might not turn out to be so affected by the prospect of a death sentence in the case before them that they render a biased judgment; typically neither eventuality can be divined at the *voir dire* stage.

If under our Constitution we viewed the disadvantage to the defendant from exclusion of unbiased prospective jurors opposed to the death penalty as equivalent to the disadvantage to the prosecution from inclusion of a biased prospective juror, then the law would impose no particular burden favoring or disfavoring exclusion. Because—at least until

today—we viewed the risks to a defendant's Sixth Amendment rights from a jury from which those who oppose capital punishment have been excluded as far more serious than the risk to the State from inclusion of particular jurors whose views about the death penalty might turn out to predispose them toward the defendant, we placed on the State an extremely high burden to justify exclusion. Cf. *In re Winship*, *supra*, at 370–373 (Harlan, J., concurring); *Speiser* v. *Randall*, 357 U. S. 513, 525–526 (1958) ("There is always in litigation a margin of error . . . . Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden . . ."). To protect the rights of the capital defendant *Witherspoon* prohibits exclusion of the ambiguous, evasive, or uncertain juror.

Later cases came to see the essence of *Witherspoon* as being embedded in the language of footnote 21 of that case. See *Adams* v. *Texas, supra; Boulden* v. *Holman, supra; Maxwell* v. *Bishop, supra.* The crucial portion of the footnote reads:

> "[N]othing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" *Witherspoon*, 391 U. S., at 522–523, n. 21 (emphasis in original).

This particular two-part inquiry, as the Court today correctly notes, *ante*, at 419, carries no talismanic significance. Its purpose is to expose the ability *vel non* of a juror to follow

instructions and abide by an oath with respect to both sentencing (the first prong) and determining guilt or innocence (the second prong).[6]   We have held that different forms of inquiry passed muster under *Witherspoon* so long as they were similarly directed at ascertaining whether a juror could follow instructions and abide by an oath.   *E. g., Adams* v. *Texas,* 448 U. S., at 44–45; *Lockett* v. *Ohio,* 438 U. S. 586, 595–596 (1978).

That permissible *Witherspoon* inquiries may depart from the language of footnote 21 does not mean, however, that the State may ignore *Witherspoon*'s strict standards of proof for exclusion when a different form of inquiry is put to the prospective juror.   We have repeatedly stressed that the essence of *Witherspoon* is its requirement that only jurors who make it unmistakably clear that their views about capital punishment would prevent or substantially impair them *from* following the law may be excluded.   *Maxwell* v. *Bishop,* 398 U. S. 262 (1970); *Boulden* v. *Holman,* 394 U. S. 478 (1969). Thus in summarily reversing several state-court decisions, this Court invalidated death sentences imposed by juries from which jurors had been excluded because their *voir dire* responses indicated ambiguity or uncertainty as to whether their views about capital punishment would affect their ability to be impartial.   *Pruett* v. *Ohio,* 403 U. S. 946 (1971), rev'g 18 Ohio St. 2d 167, 248 N. E. 2d 605 (1969); *Adams* v. *Washington,* 403 U. S. 947 (1971), rev'g 76 Wash. 2d 650, 458 P. 2d 558 (1969); *Mathis* v. *New Jersey,* 403 U. S. 946 (1971), rev'g 52 N. J. 238, 245 A. 2d 20 (1968).   And in *Lockett* v. *Ohio, supra,* we approved exclusions because the excused prospective jurors had made it "'unmistakably clear'" that

---

[6] At the time of *Witherspoon* Illinois left to the complete discretion of the jury the choice whether a convicted capital defendant lived or died. Thus any juror who would consider the death penalty under some circumstances—who, in other words, would not automatically vote against it—could abide by the instructions and oath in Illinois at the time. *Witherspoon,* 391 U. S., at 519–520.

they could not take an oath to be impartial. 438 U. S., at 596 (quoting *Witherspoon, supra,* at 522–523, n. 21). Most recently, in *Adams* v. *Texas,* this Court reaffirmed that exclusion absent a juror's unambiguously stated inability to follow the law and abide by an oath was constitutionally impermissible. 448 U. S., at 50.

### B

A comprehensive understanding of the principles of *Witherspoon* makes clear that the decision of the Court of Appeals below was correct. The court below faithfully sought to implement *Witherspoon*'s accommodation of the interests of the defendant in avoiding a jury "'uncommonly willing to condemn a man to die,'" 714 F. 2d 1069, 1076–1080 (1984) (quoting *Witherspoon, supra,* at 521), and of the State in "the necessity of excusing for cause those prospective jurors who, because of their lack of impartiality from holding unusually strong views against the death penalty, would frustrate a state's legitimate effort to administer an otherwise constitutionally valid death penalty scheme." 714 F. 2d, at 1076–1080. Following *Adams* v. *Texas, supra,* the court below articulated an accurate understanding of the stringent burdens of proof *Witherspoon* places on the State:

> "[A] prospective juror must be permitted great leeway in expressing opposition to the death penalty before he or she qualifies for dismissal for cause. A prospective juror may even concede that his or her feelings about the death penalty would possibly color an objective determination of the facts of a case without admitting of the necessary partiality to justify excusal." 714 F. 2d, at 1076–1080.

See *Adams* v. *Texas, supra,* at 49–50.

Applying this correct understanding of the law to the colloquy between the prosecutor and prospective juror Colby, the court held that Colby's "statements fall far short of the cer-

tainty required by *Witherspoon* to justify for cause excusal."
714 F. 2d, at 1082. The court traced this lack of certainty
in part to "the State's failure to frame its questions in an
appropriately unambiguous manner," given the standard of
proof the State had to meet to justify exclusion. *Ibid.* Spe-
cifically, the court criticized the State's use of the word
"interfere" in its examination:

> "The word 'interfere' admits of a great variety of inter-
> pretations, and we would find it quite unnatural for a
> person, who has already expressed her concern about
> the death penalty, to respond otherwise than that her
> feelings would 'interfere' with, 'color,' or 'affect' her
> determinations. Such a response does not indicate an
> inability, in all cases, to apply the death sentence or to
> find the defendant guilty where such a finding could lead
> to capital punishment because it fails to reflect the
> profundity of any such 'interference.'" *Ibid.*

Though critical of the prosecutor's decision to fashion his
questioning around the word "interfere," the court below did
not base its decision on this divergence from the precise
inquiry of *Witherspoon*'s footnote 21. 714 F. 2d, at 1083.[7]
Rather, the court relied on *Witherspoon*'s stringent stand-
ards of proof in deciding that the exclusion of Colby was
improper. Colby's statement that she thought her personal
views about capital punishment might interfere with "judg-

---

[7] The opinion of this Court suggests that the court below, slavishly
devoted to the precise wording of *Witherspoon*'s footnote 21, invalidated
the exclusion because the prosecutor used the word "interfere" instead of
footnote 21's language. *Ante,* at 432–434. The most cursory reading of
the court's opinion belies this representation of the decision as turning on
a semantic quibble about "synonyms and antonyms." *Ante,* at 433. In
rejecting precisely this argument below, the Court of Appeals explicitly
stated that it based its decision on an evaluation of the "totality of the
circumstances." 714 F. 2d, at 1083. Its evaluation involved far more
than the form of the question, and the opinion criticized the form of the
question only insofar as it failed to elicit a degree of certainty sufficient to
permit exclusion under *Witherspoon.*

ing [the] guilt or innocence [of the defendant]," 714 F. 2d, at 1083, was, the court held, not a sufficiently unambiguous statement of inability to follow instructions or abide by an oath to justify exclusion under applicable principles. This decision is perfectly congruent with our recent holding in *Adams*. 448 U. S., at 49–50. The court therefore ordered resentencing—not retrial—for Witt in accord with Sixth and Fourteenth Amendment requirements.[8]

---

[8] Reversing the Court of Appeals below, this Court places some weight on, and JUSTICE STEVENS concurring in the judgment gives determinative weight to, the fact that Witt's counsel did not object to the exclusion of prospective juror Colby. See *ante*, at 430–431, and n. 11, 434–435; *ante*, at 437–438 (STEVENS, J., concurring in judgment). Because the state courts did not enforce a contemporaneous-objection bar and thus ruled on Witt's claimed *Witherspoon* violation, the federal courts were of course free to consider the claim on a petition for habeas corpus. *Ulster County Court v. Allen*, 442 U. S. 140, 154 (1979). Nonetheless the Court relies on the failure to object either as evidence that Colby was not ambiguous in expressing her views, *ante* at 431, n. 11, or to suggest that defense counsel had some duty to attempt rehabilitation in order to resolve any ambiguities in Colby's testimony, *ante*, at 434–435. JUSTICE STEVENS relies on the failure to object as proof sufficient to rebut the argument that "the State's failure to make the kind of record required by *Adams* v. *Texas* constitutes an error so fundamental that it infects the validity of the death sentence in this case." *Ante*, at 438 (concurring in judgment).

With respect to the Court's reliance on the failure to object, counsel's failure could be evidence of no more than a lack of competence or attentiveness. And I fail to see how any demeanor evidence, the existence of which the Court infers from counsel's silence, could turn Colby's statement that she thought her views about capital punishment might interfere with her ability to judge guilt or innocence into an unmistakably clear declaration that she would be unable to follow instructions and abide by an oath. In any event, *Witherspoon* placed on defense counsel no burden to rehabilitate an ambiguous venireperson. As the Court of Appeals correctly held below, unless the *prosecution* resolves ambiguity to the extent of showing an unmistakably clear inability to follow the law, the juror may not be excluded.

With respect to the form of "harmless error" analysis in JUSTICE STEVENS' separate opinion, this Court has held on direct review that the improper exclusion of *one* prospective juror under *Witherspoon* precludes imposition of the death penalty irrespective of who replaces that prospec-

## II

### A

*Adams* v. *Texas, supra,* is, ironically, precisely the authority the Court today invokes to reverse the Court of Appeals below. In what must under the circumstances be taken as a tacit admission that application of *Witherspoon*'s stringent standards of proof would validate the decision of the Court of Appeals, the Court casts *Adams* as a substantial retrenchment; "the standard applied in *Adams,*" claims the Court, "differs markedly from the language of footnote 21 [of *Witherspoon*]." *Ante,* at 421. To the extent the Court reads *Adams* as eschewing unthinking adherence to the particular two-part inquiry propounded in footnote 21, I have no quarrel. See *supra,* at 445–446. The Court, however, purports to find in *Adams* a renunciation of *Witherspoon*'s stringent standards of proof. *Ante,* at 421 ("[G]one too is the extremely high burden of proof"). In essence the Court reads *Adams* as saying that there is no constitutional distinction between exclusion for death penalty bias and exclusion for other types of bias. See *Patton* v. *Yount,* 467 U. S. 1025 (1984). Had the Court of Appeals understood that this more lenient exclusion standard governed, today's opinion asserts, it would have realized that the state trial court's *voir dire* excusal of Colby should not be disturbed.

*Adams* did not, however, desert the principles of *Witherspoon.* It is the Court's brazenly revisionist reading of *Adams* today that leaves *Witherspoon* behind. JUSTICE REHNQUIST, dissenting from *Adams,* thought the opinion of the Court "expand[ed]" the scope of *Witherspoon*'s restrictions. 448 U. S., at 52. Virtually all federal and state

tive juror. *Davis* v. *Georgia,* 429 U. S. 122, 123 (1976). Particularly when a defendant's right to continue living is at issue, I fail to understand how an error held to be so fundamental as to preclude any harmless-error analysis on direct review should be treated as any less fundamental on habeas corpus review.

appellate courts considering *Witherspoon* claims in light of *Adams* have read the case as a clear endorsement of the *Witherspoon* approach encapsulated in footnote 21.   See, *e. g.*, *Darden* v. *Wainwright*, 725 F. 2d 1526, 1528–1529 (CA11 1984) (en banc); *Davis* v. *Zant*, 721 F. 2d 1478, 1486 (CA11 1983); *Spencer* v. *Zant*, 715 F. 2d 1562, 1576 (CA11 1983); *Hance* v. *Zant*, 696 F. 2d 940, 954 (CA11 1983); *O'Bryan* v. *Estelle*, 691 F. 2d 706, 709 (CA5 1982); *Burns* v. *Estelle*, 626 F. 2d 396, 397–398 (CA5 1980); *Herring* v. *State*, 446 So. 2d 1049, 1055 (Fla. 1984); *People* v. *Velasquez*, 28 Cal. 3d 461, 622 P. 2d 952 (1980); *People* v. *Gaines*, 88 Ill. 2d 342, 351–352, 430 N. E. 2d 1046, 1051 (1981); *State* v. *Mercer*, 618 S. W. 2d 1, 6 (Mo. 1981) (en banc).

One need look no further than the text of *Adams* to understand why it has been perceived until today as consistent with *Witherspoon*.   *Adams* quoted *Witherspoon*'s footnote 21 with approval and stated that the test in that footnote was "clearly designed" to accommodate both the State's interest and the defendant's interest.   *Adams, supra,* at 44.   Reaffirming that *Witherspoon* must be seen as "a limitation on the State's power to exclude," *Adams* held that "if prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out.   *Witherspoon* v. *Illinois*, 391 U. S., at 522, n. 21."   448 U. S., at 48.   In holding that the State may exclude only those whose views about capital punishment "would prevent or substantially impair" their ability to follow instructions and abide by an oath, *id.*, at 45, the Court made clear that the State may exclude only jurors whose views would lead to "*conscious* distortion or bias." *Id.*, at 46 (emphasis added).

Nothing in *Adams* suggests that the Court intended to abandon *Witherspoon*'s strict standards of proof.   The Court's intent to reaffirm these standards is evident in its approving quotation of the "unmistakably clear" language of

footnote 21, *Adams*, *supra*, at 44, and, more importantly, in its delineation of the circumstances in which exclusion is impermissible. *Adams* explicitly prohibited exclusion of jurors whose views about capital punishment might invest their deliberations with greater seriousness, 448 U. S., at 49–50, those whose views would make it emotionally more difficult for them to follow their oaths, *ibid.*, and those who cannot affirmatively say whether or not their views would distort their determinations, *id.*, at 50. Even those "who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt" may not be excluded if "they aver that they will honestly find the facts . . . if they are convinced beyond [a] reasonable doubt." *Ibid.*

*Adams* was true to *Witherspoon*'s recognition that the Constitution prohibits imposition of a death sentence by a jury from which a juror was excluded on *any broader basis* than an unambiguous affirmatively stated inability to follow instructions and abide by an oath. The Court today establishes an entirely new standard significantly more lenient than that of *Witherspoon*. The difference does not lie in the freedom of the State to depart from the precise inquiry of *Witherspoon*'s footnote 21; that freedom, as I have made clear, has long been established. See *supra*, at 445–446; *Lockett* v. *Ohio*, 438 U. S., at 595–596. The crucial departure is the decision to discard *Witherspoon*'s stringent standards of proof. The Court no longer prohibits exclusion of uncertain, vacillating, or ambiguous prospective jurors. It no longer requires an unmistakably clear showing that a prospective juror will be prevented or substantially impaired from following instructions and abiding by an oath. Instead the trial judge at *voir dire* is instructed to evaluate juror uncertainty, ambiguity, or vacillation to decide whether the juror's views about capital punishment "*might* frustrate administration of a State's death penalty scheme." *Ante*,

at 416 (emphasis added).[9]   If so, that juror may be excluded. In essence, the Court has shifted to the capital defendant the risk of a biased and unrepresentative jury.   This result debases the Sixth Amendment's jury guarantees.

## B

Rewriting *Adams* to suit present purposes, the Court has of course relieved itself of much of its burden of justification; invoking precedent, the Court dodges the obligation to provide support for its decision to deprive the capital defendant of protections long recognized as fundamental.   Nonetheless, perhaps in tacit recognition that today's departure calls for an explanation, the Court has offered three reasons for preferring what it misleadingly calls the *"Adams* test." *Ante,* at 421.   Stripped of their false lustre of precedential force, these justifications neither jointly nor severally support the Court's abandonment of *Witherspoon.*

The Court's first justification is linked to changes in the role of juries in capital cases.   Because jurors no longer have the unfettered discretion to impose or withhold capital punishment that they had in Illinois and other States at the time of *Witherspoon,* the Court asserts, there is no longer any reason to require empaneling of jurors who will merely consider a sentence of death under some circumstances.   The State

---

[9] The Court recognizes that most juror responses to death-qualifications will be ambiguous, in large part because "veniremen may not know how they will react when faced with imposing the death sentence . . . ." *Ante,* at 425.   Nevertheless, the Court goes on to ascribe to the trial judge the power to divine through demeanor alone which of such jurors "would be unable to faithfully and impartially apply the law," *ante,* at 426, and requires deference to the trial-court decisions to exclude for this reason. Not surprisingly, the Court provides no support for the rather remarkable assertion that a judge will, despite ambiguity in a juror's response, be able to perceive a juror's inability to follow the law and abide by an oath when the juror himself or herself does not yet know how he or she will react to the case at hand.

should be permitted to exclude all jurors unable to follow the guided discretion procedures that, as a result of the Court's Eighth Amendment decisions, now govern capital sentencing. *Ante,* at 422. In the interest of candor, the Court might have mentioned that precisely this analysis prompted JUSTICE REHNQUIST's dissent in *Adams.* 448 U. S., at 52 ("[A]t a time when this Court should be re-examining the doctrinal underpinnings of *Witherspoon* in light of our intervening decisions in capital cases, it instead expands that precedent as if those underpinnings had remained wholly static"). It is most curious that the identical reasoning is now marshaled to justify a "test" purportedly derived from the Court's holding in that case.

More to the point, this reasoning does not in any way justify abandonment of the restrictions *Witherspoon* has placed on the exclusion of prospective jurors. Without a doubt, a State may inquire whether a particular juror will be able to follow his or her oath to abide by the particulars of a guided discretion sentencing approach, and upon receiving an unmistakably clear negative response the State may properly move to exclude that juror. *Lockett* v. *Ohio, supra,* at 595–596. But the existence of a guided discretion scheme in no way diminishes the defendant's interest in a jury composed of a fair cross section of the community and a jury not "uncommonly willing to condemn a man to die." *Witherspoon* v. *Illinois,* 391 U. S., at 521. Even under a guided discretion proceeding a juror must have the opportunity to consider all available mitigating evidence, *Eddings* v. *Oklahoma,* 455 U. S. 104 (1982), and to decide against imposition of the death sentence in any individual case, *Woodson* v. *North Carolina,* 428 U. S. 280 (1976). Under our Constitution, the capital sentencer must undertake a sensitive "'consideration of the character and record of the individual offender and the circumstances of the particular offense as a[n] . . . indispensable part of the process of inflicting the penalty of death.'" *Eddings, supra,* at 112 (quoting *Woodson, supra,* at 304). As

*Adams* recognizes, making such judgments "is not an exact science, and the jurors . . . unavoidably exercise a range of judgment and discretion while remaining true to their instructions and their oaths." 448 U. S., at 46. That is why the State may not exclude jurors

> "who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt. Such assessments and judgments by jurors are inherent in the jury system, and to exclude all jurors who would be in the slightest way affected . . . would be to deprive the defendant of the impartial jury to which he or she is entitled under the law." *Id.*, at 50.

The risks that *Witherspoon* sought to minimize through defining high standards of proof for exclusions based on death penalty scruples are, we correctly held in *Adams*, equally prevalent in the context of guided discretion sentencing schemes.

As a second justification for the so-called "*Adams* test" the Court serves up the claim that *Witherspoon*'s footnote 21 approach was dictum. That footnote 21 might have been dictum is not, of course, an affirmative reason for adopting the particular alternative the Court advances today. Were the claim correct it would merely leave more leeway to depart from the *Witherspoon* restrictions. More importantly, the label "dictum" does not begin to convey the status that the restrictions embodied in footnote 21 have achieved in this Court and state and federal courts over the last decade and a half. See *supra*, at 445, 450–451. From *Boulden* v. *Holman*, 394 U. S. 478 (1969), and *Maxwell* v. *Bishop*, 398 U. S. 262 (1970), through *Adams*, *supra*, this Court has applied the strict burdens of proof of *Witherspoon*'s footnote 21 to invalidate sentences imposed by juries from which scrupled jurors had been too readily excluded. The Court concedes as much at another point in its opinion when it

acknowledges that footnote 21 "se[t] the standard" for subsequent cases. *Ante*, at 418.

The Court's third proffered justification is that the so-called "*Adams* standard . . . is in accord with the traditional reasons for excluding jurors and with the circumstances under which such determinations are made." *Ante*, at 423. In essence, the Court argues that the so-called *Adams* standard should be followed because it excludes jurors for bias on the same grounds and using the same standards as would be used for exclusion based on any other type of bias: "exclu[sion of] jurors because of their opposition to capital punishment is no different from excluding jurors for innumerable other reasons which result in bias . . . ." *Ante*, at 429. This position is at the core of the Court's holding in this case, but between this position and the basic principles of *Witherspoon* lies an unbridgeable chasm.

The crux of *Witherspoon* was its recognition of a constitutionally significant distinction between exclusion of jurors opposed to capital punishment and exclusion of jurors for the "innumerable other reasons which result in bias." *Ante*, at 429. The very nature of a *Witherspoon* challenge illuminates the difference. In typical cases involving an allegation of juror bias unrelated to death penalty scruples, the convicted defendant challenges the *inclusion* of particular jurors. *E. g.*, *Patton* v. *Yount*, 467 U. S. 1025 (1984); *Smith* v. *Phillips*, 455 U. S. 209 (1982). In a *Witherspoon* case the convicted defendant challenges the *exclusion* of particular jurors. If, as the Court suggests, the only interest at stake in a *Witherspoon* case is the equivalent right of the defendant and the State to impartial individual jurors, *ante*, at 423, then the entire thrust of the *Witherspoon* inquiry makes no sense. To be relevant to the right the Court claims is at stake, the inquiry would have to focus on whether the individual jurors who replaced the excluded prospective jurors were impartial; if so, then no harm would result from the exclusion of particular prospective jurors, whatever the reason for the exclusion.

*Witherspoon*, of course, focused on the very different sort of injury that might result from systematic exclusion of those opposed to capital punishment: the risk of hanging juries, 391 U. S., at 521, n. 20, from which a distinct segment of the community has been excluded. *Id.*, at 520. *Witherspoon's* prohibition against presuming bias and its requirement of an unmistakably clear showing of actual bias sufficient to prevent or substantially impair a juror's ability to abide by an oath are the means by which the risk of constitutional injury is minimized.

The Court today eliminates both protections. It rejects the rule that stricter standards govern death-qualification, and as a justification for doing so indulges precisely the presumption of bias *Witherspoon* prohibited: "we do not think, simply because a defendant is being tried for a capital crime, that he is entitled to a legal presumption or standard that allows jurors to be seated *who quite likely will be biased in his favor.*" *Ante*, at 423 (emphasis added). The trick in the majority opinion should by now be clear. The Court simply refuses to recognize the constitutional rights *Witherspoon's* stringent standards of proof were designed to safeguard. The Court limits the Sixth Amendment to the partiality *vel non* of individual jurors; "[h]ere, as elsewhere, the quest is for *jurors* who will conscientiously apply the law and find the facts." *Ante*, at 423 (emphasis added). As today's opinion would have it, the Sixth Amendment has nothing to say about the overall composititon of the jury, and in particular about the capital defendant's right to a *jury* not predisposed toward the death sentence and representative of a fair cross section of the community. A defendant's established right to a jury that reflects the community's judgment about whether the evidence supporting conviction and execution for a particular crime crosses the "reasonable doubt" threshold has been made to disappear.

This bit of legerdemain permits the Court to offer an easy analogy to exclusion for other types of bias and argue that

458

death-qualification should be evaluated under the same lenient standards. *Ante,* at 423–424. Because the Court never acknowledges the constitutional rights *Witherspoon* was meant to protect, it need not explain why *Witherspoon*'s protections are no longer needed. It is bad enough that the Court is so eager to discard well-established Sixth Amendment rights of a capital defendant for the sake of efficient capital punishment. But if the Court is to take such a precipitate step, at the very least it should acknowledge having done so and explain why these consistently recognized rights should be recognized no longer.

### III

*Witherspoon,* as the foregoing discussion makes clear, is best understood in the context of our cases preserving the integrity of the jury both as an impartial factfinder and as the voice of the community. As such the protection of *Witherspoon*'s stringent standards of proof could not be more important to the capital defendant:

> "The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. . . . Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one

judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence." *Duncan* v. *Louisiana*, 391 U. S. 145, 155–156 (1968) (footnote omitted).

Crucial to the jury right is the requirement that "the jury be a body truly representative of the community." *Smith* v. *Texas*, 311 U. S. 128, 130 (1940). As we said in *Taylor* v. *Louisiana*, 419 U. S. 522 (1975), "[t]his prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool." *Id.*, at 530. The death-qualification process is fraught with threats to these constitutional guarantees.[10]

The risk of the "overzealous prosecutor and . . . the compliant, biased, or eccentric judge," *Duncan* v. *Louisiana*, *supra*, at 156, is particularly acute in the context of a capital case. Passions, as we all know, can run to the extreme when the State tries one accused of a barbaric act against society, or one accused of a crime that—for whatever reason— inflames the community. Pressures on the government to secure a conviction, to "do something," can overwhelm even those of good conscience. See *Patton* v. *Yount*, 467 U. S., at 1053 (STEVENS, J., dissenting). When prosecutors and judges are elected, or when they harbor political ambitions, such pressures are particularly dangerous. Cf. *Spaziano* v. *Florida*, 468 U. S. 447, 467 (1984) (STEVENS, J., concurring in part and dissenting in part). With such pressures invariably being brought to bear, strict controls on the death-

---

[10] Though these cases involve systematic exclusion from the jury pool and not from a particular jury, death-qualification is the functional equivalent of exclusion from the pool. The prosecution has unlimited ability to challenge prospective jurors for cause and uses the challenges to remove all members of an identifiable segment of the community from the pool.

qualification process are imperative. Death-qualification works to the advantage of only the prosecutor; if not carefully controlled, it is tool with which the prosecutor can create a jury perhaps predisposed to convict[11] and certainly predisposed to impose the ultimate sanction.

Broad death-qualification threatens the requirement that juries be drawn from a fair cross section of the community and thus undermines both the defendant's interest in a representative body and society's interest in full community participation in capital sentencing. "One of the most important

---

[11] As noted in n. 2, *supra*, *Witherspoon* declined to hold that broad exclusion of those opposed to capital punishment would render juries conviction-prone. Since that time numerous studies have all but confirmed that death-qualified juries are conviction-prone. *E. g.*, Sequin & Horowitz, The Effects of "Death Qualification" on Juror and Jury Decisioning: An Analysis from Three Perspectives, 8 L. & Psychology Rev. 49 (1984); Fitzgerald & Ellsworth, Due Process vs. Crime Control: Death Qualification and Jury Attitudes, 8 Law and Human Behavior 31 (1984); Cowan, Thompson, & Ellsworth, The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation, 8 Law and Human Behavior 53 (1984); Thompson, Cowan, Ellsworth, & Harrington, Death Penalty Attitudes and Conviction Proneness: The Translation of Attitudes into Verdicts, 8 Law and Human Behavior 95 (1984). Some studies have even suggested that the *process* of death-qualification tends to bias remaining jurors toward the prosecution. Haney, On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process, 8 Law and Human Behavior 121 (1984).

At least one Federal District Court has held that even juries death-qualified under the strict standards of *Witherspoon* are constitutionally infirm because they are, as a matter of empirical fact, more likely to convict than a jury drawn from a fair cross section of the community. *Grigsby* v. *Mabry*, 569 F. Supp. 1273 (ED Ark. 1983) (appeal en banc pending in Eighth Circuit). One other District Court held to the same effect, *Keeton* v. *Garrison*, 578 F. Supp. 1164 (WDNC 1984), but the Fourth Circuit recently reversed this decision. *Keeton* v. *Garrison*, 742 F. 2d 129 (1984). Instead of recognizing that the process of death-qualification creates serious risks, even within the contours of *Witherspoon*, this Court abandons any limits on the process and thereby enhances the possibility of erroneous convictions as well as erroneous sentences.

functions any jury can perform in making such a selection [of life or death] is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.'" *Witherspoon*, 391 U. S., at 519, n. 15 (quoting *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (opinion of WARREN, C. J.)). As JUSTICE STEVENS wrote last Term, "if the decision that capital punishment is the appropriate sanction in extreme cases is justified because it expresses the community's moral sensibility—its demand that a given affront to humanity requires retribution—it follows . . . that a representative cross section of the community must be given the responsibility for making that decision." *Spaziano* v. *Florida, supra,* at 481 (concurring in part and dissenting in part).

That the Court would be willing to place the life of this capital defendant, and all others, in the hands of a skewed jury is unpardonable. Of perhaps equal gravity are the implications of today's opinion for the established right of every criminal defendant to a jury drawn from a fair cross section of the community. *Taylor* v. *Louisiana, supra.* If, as the Court suggests, the Sixth Amendment jury right requires only a "quest . . . for jurors who will conscientiously apply the law and find the facts," *ante*, at 423—if, in other words, the only pertinent question is whether the individual jurors are impartial, see *Duren* v. *Missouri*, 439 U. S. 357, 371, n. (1979) (REHNQUIST, J., dissenting); *Taylor* v. *Louisiana, supra,* at 538 (REHNQUIST, J., dissenting)—then the right to a jury drawn from a fair cross section of the community is lost.

## IV

Though the unexplained evisceration of *Witherspoon*'s protections of a capital defendant's Sixth Amendment rights is the most troubling accomplishment of the opinion for the Court, its discussion of the proper standard of review of

state-court *Witherspoon* determinations cannot pass without some comment. One evident purpose of the Court's redefinition of the standards governing death-qualification is to bring review of death-qualfication questions within the scope of the presumption of correctness of state-court factual findings on federal collateral review. 28 U. S. C. § 2254(d). In recent cases the Court has held that the question whether a juror is biased is a question of fact and therefore review of a trial court's *voir dire* decision to exclude or not exclude receives a presumption of correctness under § 2254(d). *E. g., Patton* v. *Yount,* 467 U. S. 1025 (1984).

Had the Court maintained *Witherspoon's* strict standards for death-qualification, there would be no question that trial-court decisions to exclude scrupled jurors would not be questions of fact subject to the presumption of correctness. Whether a prospective juror with qualms about the death penalty expressed an inability to abide by an oath with sufficient strength and clarity to justify exclusion is certainly a "mixed question"—an application of a legal standard to undisputed historical fact. Even if one were to accept the Court's redefinition of the proper standards for death-qualification, it would not follow that the Court's holding with respect to the applicability of § 2254(d) is correct. JUSTICE STEVENS, dissenting in *Patton* v. *Yount, supra,* has persuasively demonstrated that "the question whether a juror has an opinion that disqualifies is a mixed one of law and fact," *id.,* at 1052, because the question is "'whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality.'" *Ibid.,* (quoting *Irvin* v. *Dowd,* 366 U. S. 717, 723 (1961)).

## V

Today's opinion for the Court is the product of a saddening confluence of three of the most disturbing trends in our constitutional jurisprudence respecting the fundamental rights of our people. The first is the Court's unseemly eagerness to

recognize the strength of the State's interest in efficient law enforcement and to make expedient sacrifices of the constitutional rights of the criminal defendant to such interests. *United States* v. *Leon,* 468 U. S. 897, 929–930 (1984) (BRENNAN, J., dissenting). The second is the Court's increasing disaffection with the previously unquestioned principle, endorsed by every Member of this Court, that "because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment, and hence must be accompanied by unique safeguards . . . ." *Spaziano* v. *Florida,* 468 U. S., at 468 (STEVENS, J., concurring in part and dissenting in part). *E. g., Pulley* v. *Harris,* 465 U. S. 37 (1984); *Spaziano* v. *Florida, supra,* at 461–464 (opinion of the Court); *Barclay* v. *Florida,* 463 U. S. 939 (1983). The third is the Court's increasingly expansive definition of "questions of fact" calling for application of the presumption of correctness of 28 U. S. C. § 2254(d) to thwart vindication of fundamental rights in the federal courts. *E. g., Patton* v. *Yount, supra; Rushen* v. *Spain,* 464 U. S. 114 (1983); *Marshall* v. *Lonberger,* 459 U. S. 422 (1983). These trends all reflect the same desolate truth: we have lost our sense of the transcendent importance of the Bill of Rights to our society. See *United States* v. *Leon, supra,* at 980 (STEVENS, J., dissenting) ("[I]t is the very purpose of a Bill of Rights to identify values that may not be sacrificed to expediency"). We have lost too our sense of our own role as Madisonian "guardians" of these rights. See 1 Annals of Cong. 439 (1789) (remarks of James Madison). Like the death-qualified juries that the prosecution can now mold to its will to enhance the chances of victory, this Court increasingly acts as the adjunct of the State and its prosecutors in facilitating efficient and expedient conviction and execution irrespective of the Constitution's fundamental guarantees. One can only hope that this day too will soon pass.