# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CT-02143-SCT

*ANTHONY TERRELL BOOKER a/k/a ROBERT*
*BOOKER*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 05/20/2004 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROSS PARKER SIMONS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: W. DANIEL HINCHCLIFF |
| DISTRICT ATTORNEY: | ANTHONY N. LAWRENCE, III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/23/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     The facts in the case *sub judice* were aptly summarized by the Mississippi Court of

Appeals, *see **Booker v. State***, 2008 Miss. App. LEXIS 77 at *3-4 (Miss. Ct. App. January

29, 2008), and do not bear repeating.  In short, Anthony Terrell Booker was arrested for the

murder of Dorian Johnson and subsequently was indicted for capital murder.  On May 17,

2004, Booker was convicted by a jury in the Circuit Court of Jackson County and sentenced

to life imprisonment without the possibility of parole.  Booker's appeal therefrom was

assigned to the Court of Appeals, which affirmed both the conviction and sentence. *See id*.

at *27. Booker's "Petition for Writ of Certiorari," raising only the issue of improper

peremptory strikes by the prosecution pursuant to **Batson v. Kentucky**, 476 U.S. 79, 106 S.

Ct. 1712, 90 L. Ed. 2d 69 (1986),[1] was then granted by this Court.

## ISSUE

¶2.    This Court will consider:

(1) Whether the circuit court and Court of Appeals erred in finding the prosecution's peremptory strike of juror Chauncey Thompson to be permissible under **Batson**.

## ANALYSIS

¶3.    On **Batson** determinations, this Court has established that:

[a] reversal will only occur if the factual findings of the trial judge appear to be "clearly erroneous or against the overwhelming weight of the evidence." **Tanner** [**v. State**], 764 So. 2d 385, 393 (Miss. 2000) . . . . "On appellate review, the trial court's determinations under **Batson** . . . are accorded great deference because they are based, in a large part, on credibility." **Coleman v. State**, 697 So. 2d 777, 785 (Miss. 1997) . . . . The term "great deference" has been defined in the **Batson** context as meaning an insulation from appellate reversal any trial findings which are not clearly erroneous. **Lockett v. State**, 517 So. 2d [1346,] 1349 (Miss. 1987).

---

[1]The precise question presented by Booker was "[d]id the trial court and the Court of Appeals err in failing to rule that the district attorney violated **Batson** by using false information and giving pretextual justifications to support the strikes of minority jurors Chauncey Thompson and Alden Stallworth." Under Mississippi Rule of Appellate Procedure 17(h), "[t]he Supreme Court may limit the question on review." Miss. R. App. P. 17(h). Finding Booker's argument regarding juror Alden Stallworth without merit as discussed by the Court of Appeals, *see **Booker**, 2008 Miss. App. LEXIS 77 at *16-17, no further discussion is warranted. We limit our analysis to the prosecution's peremptory strike of juror Chauncey Thompson. *See* paragraph 2 *infra*.

***Smith v. State***, 835 So. 2d 927, 940 (Miss. 2002).  Our standard conforms to that recently enunciated by the United States Supreme Court.  "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous[2]."  ***Snyder v. Louisiana***, 128 S. Ct. 1203, 1207, 170 L. Ed. 2d 175, 185, 2008 U.S. LEXIS 2708 at *21 (2008).  *See also* ***Hernandez v. New York***, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (quoting ***Wainwright v. Witt***, 469 U.S. 412, 428, 83 L. Ed. 2d 841, 105 S. Ct. 844 (1985)) ("[d]eference to trial court findings on the issue of discriminatory intent makes particular sense in this context because . . . evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'").  In ***Hernandez***, the United States Supreme Court added that "in the absence of exceptional circumstances, we would defer to [the trial court]."  ***Hernandez***, 500 U.S. at 366.

¶4.    This Court previously has stated that:

[t]he ***Batson*** doctrine is not concerned with racial, gender, or ethnic balance on petit juries, and it does not hold that a party is entitled to a jury composed of or including members of [a] cognizable group.  Rather, *it is concerned exclusively with discriminatory*[3] *intent*[4] *on the part of the* ***lawyer*** *against whose use of his peremptory strikes the objection is interposed.*

---

[2]As the United States Supreme Court has stated, under the "clearly erroneous" standard, it "will not reverse a lower court's finding of fact simply because we would have decided the case differently." ***Easley v. Cromartie***, 532 U.S. 234, 242, 121 S. Ct. 1452, 149 L. Ed. 2d 430 (2001) (internal quotation marks omitted).  Instead, the reviewing court must ask "whether, 'on the entire evidence,' it is 'left with the *definite and firm conviction that [a] mistake has been committed*.'" ***Id***. (quoting ***United States v. United States Gypsum Co.***, 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948)) (emphasis added).

[3]"Discriminatory" is defined as "[d]isplaying or marked by prejudice: biased." Webster's II New College Dictionary 325 (3d ed. 2001).

[4]"Intent" is defined as "[t]hat which is intended: purpose." Webster's II New College Dictionary at 576.

***Strickland v. State***, 980 So. 2d 908, 915 (Miss. 2008) (quoting ***Ryals v. State***, 794 So. 2d

161, 164 (Miss. 2001)) (emphasis added). *See also **Snyder***, 128 S. Ct. at 1208 (quoting

***United States v. Vasquez-Lopez***, 22 F. 3d 900, 902 (9th Cir. 1994)) ("the Constitution

forbids striking even a single prospective juror for a discriminatory purpose."). To satisfy

***Batson***, "[t]he trial court must . . . determine whether the objecting party has met their burden

to prove there has been *purposeful*[5] *discrimination*[6] in the exercise of peremptory

challenges." ***Carter v. State***, 799 So. 2d 40, 46 (Miss. 2001) (quoting ***Stewart v. State***, 662

So. 2d 552, 557-58 (Miss. 1995)) (emphasis added). *See also **Flowers v. State***, 947 So. 2d

910, 917 (Miss. 2007) (citing ***Berry v. State***, 802 So. 2d 1033, 1042 (Miss. 2001)) ("[t]he

burden remains on the opponent of the strike to show that the race-neutral explanation given

is merely a *pretext*[7] *for racial discrimination*") (emphasis added). Therefore, under ***Batson***,

the pretextual reason proffered by the prosecutor must be intended to disguise *purposeful*

*racial discrimination*. *See **Strickland***, 980 So. 2d at 915; ***Flowers***, 947 So. 2d at 917; ***Carter***,

---

[5]"Purposeful" is defined as "[h]aving a purpose: intentional." Webster's II New College Dictionary at 900. Additionally, "purpose" is defined as "1. The object toward which one strives or for which something exists: goal. 2. A desired or intended result or effect." *Id*.

[6]"Discrimination" is defined as "[a] prejudiced act." Webster's II New College Dictionary at 325.

[7]"Pretext" is defined as the "[o]stensible reason or motive assigned or assumed *as a color or cover for the real reason or motive*; false appearance, pretense." Black's Law Dictionary 1351 (4th ed. 1968) (emphasis added). *See also* Webster's II New College Dictionary at 876 (defining "pretext" as "[o]stensible purpose: excuse."). By contrast, a "mistake" is defined as "1. An error: fault. 2. A misconception: misunderstanding." *Id*. at 702.

4

799 So. 2d at 46. Stated otherwise, the race-neutral reason proffered by the prosecutor must be a false cover for an intentional, racially discriminatory purpose.

¶5.    In considering Booker's *Batson* challenges at trial, the record clearly establishes the learned circuit judge's appreciation of the legal principles involved. Specifically:

> the procedure to follow on a *Batson* challenge is for the Court to indicate whether there seems to be a pattern and whether the movant has established a prima facie case for relief under *Batson*. . . . [T]here were five African-American jurors on that particular panel, and . . . of those five, four were struck by the State of Mississippi. I think that is sufficient to require the State to state for the record and for the Court's consideration race-neutral reasons for the strikes.

Thereafter, Assistant District Attorney Timothy Jones responded, with respect to Thompson, that:

> [t]he State's race-neutral reason . . . is that, in checking the names of our jurors, we found that he has had a marijuana conviction, a driver's license violation, an insurance violation, a seat belt violation in Pascagoula. He was convicted on 2/5/03. And on those bases, especially the marijuana conviction, Judge, we didn't want a convicted marijuana holder on the jury.

Circuit Judge Dale Harkey then concluded, "I find the existence of that prior criminal history is sufficiently race-neutral to justify a . . . peremptory strike."

¶6.    Post-conviction, Booker filed a motion for a new trial, asserting that "[t]he trial court erred in failing to sustain [Booker's] *Batson* challenges on five (5) Afro-American potential jurors who were peremptorily excused by the State." In support of his motion, an affidavit of City Court Clerk Rhonda Diehl was presented to the trial judge. That affidavit provides:

> [t]hat on the morning of May 17, 2004, Investigator Scott McIrath, of the District Attorney's Office, Pascagoula, Mississippi called your Affiant and made inquiry as to any criminal record that the potential juror, Chauncey D. Thompson, may have had with said Police Department; that your Affiant ran the name given to her by the Investigator and advised that the potential juror

5

had been charged with four (4) misdemeanor crimes, they being Simple Possession of Marijuana, No Driver's License, No Liability Insurance and a Seat Belt Violation; that your Affiant further advised said Investigator that all of these charges had been dismissed by the City for the reason that said potential juror was not the person who committed said four alleged misdemeanor crimes. Attached hereto is a print-out that was used by said Affiant when she furnished said Investigator with the information.

In response, District Attorney Tony Lawrence replied:

Your Honor, Mr. McIrath, the investigator in my office, has been in law enforcement for twenty-something years, looks at every venire list that this office gets, and he goes in there and sees if there's names he recognizes. He's been in the business forever. This was one of them. He called up there . . . [.] And the affidavit confirms that the information was given to him that this man had been charged with four offenses.

Now, whether those offenses had been dismissed, we didn't have at that time. He got the first information. So, [defense counsel George Shaddock] is providing this other information. The information the State got from Mr. McIrath's calling the police department was read into the record, so Your Honor will be able to clearly see exactly what the State knew at that time. But it confirms that this man was charged with a crime. Four crimes.

The circuit court, uniquely in a position to observe the demeanor and assess the credibility of the district attorney's reply, found "*no evident untruths or dishonesty at all involved on the part of the State of Mississippi.*"[8] (Emphasis added). Speaking to defense counsel, the trial judge added "your subsequent investigation as evidenced by these affidavits that you've submitted as exhibits don't indicate to me any basis for believing . . . that these were lies told by the State of Mississippi."

---

[8]Thereby distinguishing this case from *Snyder*, wherein the United States Supreme Court found that "[r]ather than making a specific finding on the record concerning Mr. Brooks' demeanor, the trial judge simply allowed the challenge without explanation." *Snyder*, 128 S. Ct. at 1209. Nothing in the record renders Circuit Judge Harkey's judgment implausible.

6

¶7.    This ruling is entitled to "great deference[,]" *see **Smith***, 835 So. 2d at 940, and ought

not be reversed "simply because we would have decided the case differently." ***Easley***, 532

U.S. at 242.  Rather, this Court must have a "definite and firm conviction that a mistake has

been committed." ***Id***. (quoting ***United States Gypsum Co.***, 333 U.S. at 395).  *See also*

***Snyder***, 128 S. Ct. at 1207-08 (given the trial court's "pivotal role in evaluating ***Batson***

claims[,]" the "trial court's ruling on the issue of discriminatory intent must be sustained

unless it is clearly erroneous.").  How can that requisite "definite and firm conviction" be

reached, given clear evidence to the contrary?  To do so requires a presumption of pretext

by the prosecutors, when the evidence reflects, at best, no more than a mistaken belief.  For

***Batson*** purposes, the investigator's motive (real or presumed) is irrelevant, absent proof of

knowledge by the lawyer exercising the peremptory strikes.  *See **Strickland***, 980 So. 2d at

915 (quoting ***Ryals***, 794 So. 2d at 164) (***Batson*** "is concerned exclusively with

discriminatory intent on the part of the ***lawyer*** against whose use of his peremptory strikes

the objection is interposed.") (Emphasis added).  Nonetheless, in his dissent, Justice Graves

accuses District Attorney Lawrence and/or Assistant District Attorney Jones of making

"blatant" and "deliberate"[9] misrepresentations[10] (Graves, J., Dissenting Opinion at paragraph

18) to Circuit Judge Harkey, an obligatory prerequisite under the facts of this specific case,

to reach this conclusion.  This omniscient finding is diametrically opposed to the eyewitness

impressions recorded by the trial judge in the record, in fulfilling his pivotal role in

---

[9]"Deliberate" is defined as "1a.  Thought out or planned in advance: Premeditated.
1b.  Said or done intentionally."  Webster's II New College Dictionary at 298.

[10]Or "lies," as referred to by the trial judge.  *See* paragraph 6 *supra*.

evaluating ***Batson*** claims. Not a single witness or document gives this reviewing Court knowledge of what was conveyed to the prosecutors or special insight into either prosecutor's state of mind, demeanor, or credibility. It is clear that the ever-present arbiter of justice, the trial judge, did not see, sense, hear, or discern these "lies." There is no evidentiary basis in the record that the prosecutors knowingly or purposefully offered false information to the trial court to disguise their real motivation. It is more plausible that the State's race-neutral reason was based upon an honest, albeit mistaken, belief. That determination is best left in the capable hands of the trial judge. *See **Snyder***, 128 S. Ct. at 1208 (citations omitted) (determination of the demeanor of the attorney exercising the challenge is "particularly within a trial judge's province[.]"); ***Hernandez***, 500 U.S. at 365.

¶8.    Moreover, no evidence is present in this record that would justify a "definite and firm conviction" of purposeful racial discrimination. As the Court of Appeals commented in dicta, "it is quite apparent that, if district attorney Lawrence had accurate information at the time of his peremptory strike of Thompson, such factually accurate information was clearly still sufficient to establish a non-pretextual race-neutral reason for the strike." ***Booker***, 2008 Miss. App. LEXIS 77 at *16. Specifically, District Attorney Lawrence stated at the hearing on the motion for new trial that:

> [Thompson] was charged and dismissed, because it wasn't the right guy. That's the biggest race-neutral reason I've ever seen when I'm putting someone on a jury. Someone who's been charged by the police and dismissed because it was the wrong guy, I don't want him thinking on the jury this may be the wrong guy, too.

8

However, the proper test is measuring what was known when the *Batson* decision was first made, during the jury-selection process, and for purposes of this opinion, the post-trial reasoning is disregarded.

¶9.    In sum, this Court is not a divine overseer of all things *Batson*, and assuming such sovereignty would offend the great deference the law requires to be extended to trial courts. In the case *sub judice*, the learned trial judge found "no evident untruths or dishonesty at all involved on the part of the State of Mississippi."   This finding, the byproduct of the eyewitness impressions recorded by the trial judge in fulfilling his pivotal role in evaluating *Batson* claims, is entitled to "great deference."  *Smith*, 835 So. 2d at 940.  In other cases, perhaps a cold appellate record could reveal facts from which an appellate court could safely declare error.  But such is not the case here.  The record reveals not a single "blatant" and/or "deliberate" misrepresentation (Graves, J., Dissenting Opinion at paragraph 18), and the trial judge, acting within his province, *see Snyder*, 128 S. Ct. at 1208, found the proffered reason was credible, implicitly determining that the prosecutors' demeanor did not reveal a discriminatory intent.  We can be assured of this observation, for the record reveals a clear understanding by both District Attorney Lawrence and Circuit Judge Harkey of their duties and responsibilities *vis-a-vis* their oaths of office and the edicts of this Court regarding *Batson*.  To accept the conclusions of Justice Graves's dissent, one must surmise that District Attorney Lawrence and Assistant District Attorney Jones are not only liars, but that they also acted in an intentional, premeditated, and racially discriminatory manner.  Furthermore, one would also have to surmise that Circuit Judge Harkey either lacks the legal acumen to recognize a prohibited exercise of challenges occurring before his own eyes and ears; or,

9

worse yet, was complicit in allowing the prohibited exercise. I decline to accept either based on a concoction of suspicion, guesswork, and speculation (with a dash of conjecture) all derived from an affidavit asserting what an investigator knew, but revealing nothing as to what the prosecuting attorneys knew. Such a conclusion requires stacking inference upon inference, thus miserably failing to satisfy the requisite legal standard that there must be a "definite and firm conviction that a mistake has been committed." *Easley*, 532 U.S. at 242 (quoting *United States Gypsum Co.*, 333 U.S. at 395).

## CONCLUSION

¶10.   Based upon the aforementioned analysis, this Court affirms the Court of Appeals' affirmance of Booker's conviction and sentence in the Circuit Court of Jackson County.

¶11.   **THE JUDGMENTS OF THE COURT OF APPEALS AND THE CIRCUIT COURT OF JACKSON COUNTY ARE AFFIRMED. CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, C.J., EASLEY, CARLSON AND LAMAR, JJ., CONCUR. GRAVES, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, P.J. AND IN PART BY WALLER, P.J. AND DICKINSON, J.   DICKINSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER AND DIAZ, P.JJ. AND IN PART BY GRAVES, J.**

**GRAVES, JUSTICE, DISSENTING:**

¶12.  The majority of this Court chooses to ignore the blatant misrepresentations[11] by a prosecutor in order to wrongfully remove an African-American from the jury.  Because I would find that the trial court erred in failing to grant Anthony Terrell Booker's motion for new trial, I respectfully dissent.

¶13.  On December 30, 2002, Booker, Shawn Davis, Mary Scarbough, and Desmond Shields were involved in the beating death of Dorian Johnson.  Booker, Davis, Scarbough, and Shields were arrested on January 6, 2003, and charged with Johnson's death.  After a severance, Booker was tried on May 17, 2004.  During voir dire, prosecutors moved to strike juror Chauncey Thompson, Juror 14, an African-American, on the basis of prior convictions.  The trial court denied Booker's request for time to investigate the alleged prior convictions.  Booker was convicted of capital murder on May 20, 2004, and sentenced to life imprisonment without the possibility of parole.

¶14.  Thereafter, Booker filed a motion for new trial.  At the hearing on the motion for new trial, Booker introduced an affidavit from the Pascagoula City Court Clerk that Thompson had no prior convictions and that she had provided that information to an investigator from the district attorney's office prior to the trial.  Those facts were uncontroverted.  The trial court denied Booker's motion for a new trial and Booker appealed.  This Court assigned the

_____

[11]Without reference to any specific conclusions, the majority opinion asserts that "[t]o accept the conclusions of [this] dissent, one must surmise that District Attorney Lawrence and Assistant District Attorney Jones are not only liars, but that they also acted in an intentional, premeditated, and racially discriminatory manner."  However, this opinion never refers to either prosecutor as a liar, nor does it comment on whether their actions were premeditated.  The majority further attempts to personalize this matter by specifically and repeatedly identifying the participants.  However, the identity of the participants is irrelevant.  It is their conduct which compels the result in this case.

11

case to the Court of Appeals, which affirmed Booker's conviction. Booker filed a petition for writ of certiorari, asserting that prosecutors knowingly gave false information to the trial court as a purportedly race-neutral justification for striking Chauncey Thompson, Juror 14, an African-American, from Booker's venire in violation of **Batson v. Kentucky**, 476 U.S. 79,106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

¶15.    Under **Batson**, a defendant must establish a prima facie case of purposeful discrimination as follows:

> To establish such a case, the defendant first must show that he is a member of a cognizable racial group . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." . . . Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

**Batson**, 476 U.S. at 96 (citations omitted). Once the defendant has established a prima facie case of discrimination, the burden shifts to the State to provide a race-neutral reason for each strike. **Id.** at 97. The trial court then makes a determination of whether the defendant has established purposeful discrimination. **Id.** at 98.

¶16.    This Court has held that in reviewing a **Batson** claim, we will not overrule a circuit court unless the record indicates the decision was clearly erroneous or contrary to the overwhelming weight of the evidence. **Flowers v. State**, 947 So. 2d 910, 917 (Miss. 2007).

> This Court has recognized five indicia of pretext that are relevant when analyzing the race-neutral reasons offered by the proponent of a peremptory strike, specifically:
>> (1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the

12

challenge; (2) the failure to voir dire as to the characteristic cited; . . . (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.

*Id.*

¶17.   As this Court has found:

Because racially-motivated jury selection is still prevalent twenty years after ***Batson*** was handed down and because this case evinces an effort by the State to exclude African-Americans from jury service, we agree that it is "necessary to reconsider ***Batson's*** test and the peremptory challenge system as a whole." ***Miller-El***, 125 S. Ct. at 2344 (Breyer, J., concurring). While the ***Batson*** test was developed to eradicate racially discriminatory practices in selecting a jury, prosecuting and defending attorneys alike have manipulated ***Batson*** to a point that in many instances the voir dire process has devolved into "an exercise in finding race neutral reasons to justify racially motivated strikes." ***Howell*** [***v. State***], 860 So. 2d at 766 (Graves, J., dissenting). When ***Batson*** was handed down, Justice Marshall predicted that "[m]erely allowing defendants the opportunity to challenge the racially discriminatory use of peremptory challenges in individual cases will not end the illegitimate use of the peremptory challenge." ***Batson***, 476 U.S. at 105 (Marshall, J., concurring). Unfortunately, as this case has shown, Justice Marshall was correct in predicting that this problem would not subside. His solution to this problem was to ban peremptory challenges outright, a position later advocated by Mississippi Supreme Court Justice Michael Sullivan. *See **Batson***, 476 U.S. at 108 (Marshall, J., concurring) (stating that "only by banning peremptories entirely can such discrimination be ended."); ***Thorson v. State***, 653 So. 2d 876, 896 (Miss. 1994) (Sullivan, J., concurring) (stating that "the proper remedy for this type of situation is the complete elimination of peremptory challenges in the trial courts of Mississippi.").

***Flowers v. State***, 947 So. 2d 910, 937 (Miss. 2007).

¶18.   I cannot ignore or condone a  prosecutor's blatant misrepresentation of facts to the trial court.  The prosecutor in this case repeatedly represented to the court that he verified that juror Chauncey Thompson had multiple **convictions**.  Those representations were false. He simply could not have "verified" a non-fact.  There is an unrebutted affidavit from the municipal court clerk which clearly indicates that the prosecutor's office was informed

13

before the trial that juror Thompson had been charged but that those charges were dismissed because they were against the wrong person. Such a blatant, deliberate and repetitive misrepresentation by a prosecutor should not be condoned.

¶19. In offering a purportedly race-neutral reason for striking juror Thompson, the following exchange occurred:

> BY MR. JONES [Prosecutor]: Judge, the first Batson challenge arises with Juror Number 14, Chauncey Thompson. The State's race-neutral reason, Judge, is that, in checking the name of our jurors, we found that he has had a **marijuana conviction**, **a driver's license violation, an insurance violation, a seat belt violation in Pascagoula**. **He was convicted on 2/5/03.** And on those bases, especially the **marijuana conviction**, Judge, **we didn't want a convicted marijuana holder on our jury**.
>
> BY MR. SHADDOCK (Counsel for Booker): Are you talking about a misdemeanor?
>
> BY MR. LAWRENCE (Prosecutor): Misdemeanor.
>
> BY THE COURT: A convicted marijuana holder?
>
> BY MR. JONES: Or a user or . . .
>
> BY THE COURT: **And that information was verified through what source?**
>
> BY MR. JONES: **Through the Pascagoula City Court**.
>
> BY MR. SHADDOCK: We'd like a copy of it. Judge, he's a 29-year-old black male that works at Sears, Roebuck and Company and has a college education, and they want to kick him off. He was born and raised in this county.
>
> BY THE COURT: Well I find that the existence of that prior criminal history is sufficiently race-neutral to justify a peremptory challenge, a peremptory strike.
>
> BY MR. SHADDOCK: Judge, I'd like to see it.
>
> BY THE COURT: If that information is available, Mr. Jones?
>
> BY MR. JONES: Yes, sir. **It's a matter of record with the Pascagoula Municipal Court. His conviction date is February the 5th, 2003.** You can go get it.
>
> BY MR. SHADDOCK: Well, I mean, I don't have access to the Pascagoula Police Department.
>
> BY MR. LAWRENCE: **We just called, Your Honor. That's how we got it, over the telephone.**

14

BY MR. SHADDOCK: Well, they won't give me – you know, if we do have some privacies left in this country, they won't give it to me. I don't think. I'll go try.

BY MR. JONES: **And I assure you we're not making that up, Judge**.

BY THE COURT: In regard to – I've made my rulings. . . .

(Emphasis added). Both the district attorney and the assistant district attorney participated in this colloquy with the trial court. There were at least five separate declarations by the prosecutors that the information was accurate. Those declarations are: 1) "[W]e found that he has had a marijuana conviction. . . ."; 2) "Through the Pascagoula City Court" in response to the trial court's question of how the information was verified; 3) "It's a matter of record with the Pascagoula Municipal Court. His conviction date is February the 5th, 2003. You can go get it."; 4) "We just called, Your Honor. That's how we got it, over the telephone."; and 5) "And I assure you we're not making that up, Judge." The prosecution had numerous opportunities to provide accurate information and failed to do so.

¶20. Later, Shaddock asked the following: "I would like permission to have about 30 minutes to do a little investigating, if I might, on these Batson challenges." However, the State objected to this request, saying an investigation could be done after the trial was finished. The trial court denied Shaddock's request and moved forward with the trial. After the trial, Shaddock raised the issue in his motion for new trial. In support of his motion, Shaddock offered an affidavit of the Pascagoula City Court Clerk Rhonda Diehl stating:

> That on the morning of May 17, 2004, Investigator Scott McIrath [sic], of the District Attorney's Office, Pascagoula, Mississippi, called your Affiant and made inquiry as to any criminal record that the potential juror, Chauncey D. Thompson, may have had with said Police Department; that your Affiant ran the name given to her by the Investigator and advised that the potential juror had been charged with four (4) misdemeanor crimes, they being Simple Possession of Marijuana, No Driver's License, No Liability Insurance and a

15

Seat Belt Violation; that your Affiant further advised said Investigator that all of these charges had been dismissed by the City for the reason that said potential juror was not the person who committed said four alleged misdemeanor crimes. Attached hereto is a copy of a print-out that was used by said Affiant when she furnished said Investigator with the information.

This affidavit is unrebutted.

¶21. As acknowledged by the majority, the "race-neutral reason proffered by the prosecutor must be a false cover for an intentional, racially discriminatory purpose." Surely, these facts fit that description. In the instant case, we have a prosecutor falsely telling the trial court that he has confirmed that an African-American juror has multiple convictions, when in fact he has confirmed no such thing and there are and never were any convictions. Moreover, during the motion for new trial, the prosecutor had ample opportunity to provide an explanation for the false statements made about juror Thompson, but merely said:

> Your Honor, Mr. McIlrath, the investigator in my office, has been in law enforcement for twenty-something years, looks at every venire list that this office gets, and he goes in there and sees if there's names he recognizes. He's been in the business forever. This was one of them. He called up there. . . And the affidavit confirms that the information was given to him that this man had been **charged** with four offenses.
>      Now, whether those offenses had been dismissed, we didn't have at that time. He got the first information. . . . The information the State got from Mr. McIlrath's calling the police department was read into the record, so Your Honor will be able to clearly see exactly what the State knew at that time. But it confirms that this man was **charged** with a crime. Four crimes.
>      And let's take it a step further. Mr. Shaddock says – and I don't know if this is right, because I was just given the affidavit – that he was charged and dismissed, because it wasn't the right guy. . . .

(Emphasis added).

¶22. No explanation whatsoever was given by the prosecutor in response to the city clerk's affidavit. Any so-called explanation for the misrepresentations offered by the majority are

16

based on speculation and conjecture. Further, the State even contradicted itself in the explanation as to the information provided by the investigator. During voir dire, the prosecutor repeatedly referred to Thompson's **convictions** and told the trial court that he had confirmed those **convictions** and went so far as to refer to Thompson as a "**convicted marijuana holder**" and to provide the date of conviction. However, during the hearing on the motion for new trial, the prosecutor admitted that he was never told of any convictions, but rather said he was merely told of some **charges**. Also, this is further rebutted by the affidavit from the city clerk set out above that she told the investigator the charges had been dismissed.

¶23. The majority opinion refers to the evidence contained in the record as a "concoction." Assuming arguendo that it is a "concoction," then it is a "concoction" that is undiluted by any rebuttal from either the district attorney or the assistant district attorney. There was a full-blown hearing before the trial court where the challenge against Juror Thompson was discussed and the prosecution confirmed that what was conveyed to the trial court at trial was not the information conveyed to either the investigator or conveyed to the prosecutors. Prosecutors told the trial court during voir dire that Thompson had several convictions, but later explained they were merely told he had some charges, charges that were brought against the wrong person and later dismissed. There is not one scintilla of evidence in the record to support any finding that the prosecutors did not know the truth regarding Thompson.

¶24. The city clerk's affidavit is unrebutted, the prosecutors' misrepresentations are unexplained and the majority decision is unfair. For these reasons, I would find that the trial

17

court erred in failing to grant Booker's Motion for New Trial. Further, I would reverse Booker's conviction and sentence and remand this case to the trial court for a new trial.

**DIAZ, P.J., JOINS THIS OPINION. WALLER, P.J., AND DICKINSON, J., JOIN THIS OPINION IN PART.**

**DICKINSON, JUSTICE, DISSENTING:**

¶25. There is no dispute in this case that the trial court found the defense sustained its burden under ***Batson v. Kentucky***[12] of making a prima facie showing that the State struck an African-American juror, Chauncey Thompson, because of his race. At that point, the burden shifted to the State to rebut the prima facie showing of discrimination by offering a race-neutral reason for striking Thompson. Because the State failed to establish a race-neutral reason, I cannot join the majority, and I respectfully dissent.

**I.**

¶26. Two prosecutors were present on the morning of voir dire. Prosecutor Jones stated that the race-neutral reason for striking Thompson was that he had a "marijuana conviction." The trial judge asked Prosecutor Jones how the information had been verified, and Jones responded, "through the Pascagoula City Court." Defense counsel questioned the truth of the alleged race-neutral reason, and Prosecutor Lawrence stated, "We just called, your Honor. That's how we got it, over the telephone." Still dissatisfied with the State's assertion that Thompson had been convicted of a crime, defense counsel requested "thirty minutes to do a little investigating . . . on these ***Batson*** challenges." Jones objected to the delay, stating

---

[12]***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

18

that "any investigation can be done after we finish the trial." The trial judge denied the request, and allowed the State to exclude Thompson as a juror.

¶27. After his client was convicted, defense counsel took Jones up on his invitation to investigate the matter after trial. In doing so, he discovered not only that Thompson had not been convicted of a crime, but also that the city court clerk had so informed the State's investigator on the morning of trial. The city court clerk signed an affidavit to that effect. Armed with this information (which many would justifiably view as a smoking gun), Shaddock filed a post-trial motion for a new trial.

¶28. At the post-trial hearing, Shaddock provided the following argument:

> The next affidavit . . . is by the City Court Clerk, and it deals with a gentleman named Chauncey D. Thompson, who was Number 14 on the jury. If you recall, the State said their race-neutral reason was, this guy had been convicted, or charged with possession of marijuana in the City Court. And that wasn't quite the truth. And this affidavit so bears that out. It says that on the morning of the trial, May 17, 2004, Scott McIlrath calls the City Court Clerk. The only person she [sic] asked about is this Black male. She advises him he had been charged with four misdemeanors and they had all been dismissed, they had the wrong person.

¶29. Thus, we have the City Court Clerk's sworn affidavit that the prosecutor's representation to the trial court on the morning of voir dire was not true. One would think the trial court would have demanded an explanation or, at the very least, the prosecutor would have demanded an opportunity to clear the record and explain what happened. In fact, what happened was nothing. The prosecutor's response to the discrepancy was:

> He [the investigator] called up there . . . [ellipsis in original] And the affidavit confirms that the information was given to him that this man had been charged with four offenses. Now, whether those offenses had been dismissed, we didn't have at that time. He got the first information. So, Mr. Shaddock is providing this other information. The information the State got from Mr.

19

McIlrath's calling the police department was read into the record, so Your Honor will be able to clearly see exactly what the State knew at that time. . .

This response provides no information. But even if the trial court took the prosecutor's explanation to mean that the city court clerk was not telling the truth in her affidavit, the court's later ruling is not consistent with such a finding. In upholding the State's peremptory strike of Thompson, the trial court stated that "the substance of the reasons offered by the State of Mississippi at the time the challenge was made . . . the substance of those rulings I find to be substantiated by the affidavits and exhibits that have been introduced here."

¶30. In other words, the trial court seemed to be of the opinion that the city court clerk's affidavit substantiated what the prosecutors had said on the morning of voir dire. Nothing could be further from the truth. The affidavit directly, unequivocally, and unquestionably contradicted the prosecutors' representations to the trial court.

¶31. It is not my purpose to determine whether the prosecutors' misrepresentations were honest mistakes on the part of the city court clerk, the investigator, or one of the prosecutors. My guess is there was a miscommunication. Who knows? But my guesswork cannot substitute for my obligation to apply the law.

## II.

¶32. The theory and logic supporting the United States Supreme Court's ruling in **Batson** is fairly simple. But applying **Batson** and its progeny to real-life cases has perplexed trial and appellate judges for two decades, and continues to do so today. The black-letter law of **Batson** was recently restated as follows:

Batson provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race: "First, a defendant must

20

make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination."

*Snyder v. Louisiana*, 128 S. Ct. 1203, 1207, 170 L. Ed. 2d 175, 180-181 (2008) (citations omitted).

¶33.    Although volumes of litigation and appellate discussion have addressed what is necessary to satisfy the first step, that is, "a prima facie showing that a peremptory challenge has been exercised on the basis of race," we do not need to go there today because the trial judge found the defendant had established a prima facie case, and the State does not challenge that finding.

¶34.    Given that the defendant made a prima facie showing of racial discrimination, the prosecutor was required to satisfy the second step, that is, "the prosecution must offer a race-neutral basis for striking" the juror. This the prosecutor did not do. Thus, because the State never satisfied *Batson's* second step, the inquiry should end. Instead, the majority goes on to the third step and grants the trial judge the discretion to conclude that, even though the State had no legitimate race-neutral reason for striking Thompson, the prosecutor had no intent to discriminate. Because I do not believe *Batson* provides the trial judge, or us, that discretion, I respectfully dissent.

        **WALLER AND DIAZ, P.JJ., JOIN THIS OPINION. GRAVES, J., JOINS THIS OPINION IN PART**.

21