Justice Stevens,
with whom Justice Souter, Justice Ginsburg, and Justice Breyer join, dissenting.
Millions of Americans oppose the death penalty. A cross section of virtually every community in the country includes citizens who firmly believe the death penalty is unjust but who nevertheless are qualified to serve as jurors in capital cases. An individual’s opinion that a life sentence without the possibility of parole is the severest sentence that should be imposed in all but the most heinous cases does not even arguably “ ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ ” Wainwright v. Witt, 469 U. S. 412, 420 (1985) (emphasis deleted). Moreover, an individual who maintains such a position, or even one who opposes the death penalty as a general matter, “ ‘may not be challenged for cause based on his views about capital punishment.’” Ibid. Today the Court ignores these well-established principles, choosing instead to defer blindly to a state court’s erroneous characterization of a juror’s voir dire testimony.[1] Although this case *36 comes to us under the standard of review imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, the level of deference given by the Court to the state courts in this case is completely unwarranted based on the record before us. Because I find no justification in the record or elsewhere for the decision to strike Juror Z for cause, I must dissent.
I
When the State challenged Juror Z, it argued that he was “confused about the conditions under which [the death penalty] could be imposed and seemed to believe it only appropriate when there was a risk of release and recidivism.” Ante, at 15. A more accurate characterization of Juror Z’s testimony is that although he harbored some general reservations about the death penalty, he stated that he could consider and would vote to impose the death penalty where appropriate.[2] When asked for “an idea ... of the underlying *37 reason why you think the death penalty is appropriate [or] what purpose it serves,” Juror Z responded that “the type of situation” in which the death penalty would be appropriate was “if a person [was] incorrigible and would reviolate if released.” App. 62 (emphasis added). After it was explained to Juror Z that the only two sentencing alternatives available under Washington law would be life imprisonment without the possibility of parole and a death sentence, Juror Z repeatedly confirmed that even if he knew the defendant would never be released, he would still be able to consider and vote for the death penalty. Id., at 62, 72, 73. As for any general reservations Juror Z may have had about the imposition of the death penalty, it is clear from his testimony that he was in no way categorically opposed to it. When asked whether he was “a little more comfortable that it is being used some of the time,” Juror Z responded in the affirmative. Id., at 63.
While such testimony might justify a prosecutor’s peremptory challenge, until today not one of the many cases decided in the wake of Witherspoon v. Illinois, 391 U. S. 510 (1968), has suggested that such a view would support a challenge for cause. The distinction that our cases require trial judges to draw is not between jurors who are in favor of the death penalty and those who oppose it, but rather between two subclasses within the latter class — those who will conscientiously apply the law and those whose conscientious scruples necessarily prevent them from doing so.[3] *3 As then-justice *38 Rehnquist explained in his opinion for the Court in Lockhart v. McCree, 476 U. S. 162, 176 (1986):
“It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital eases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.”
Today’s opinion simply ignores the justification for this strict rule. As we explained 20 years ago:
“The State’s power to exclude for cause jurors from capital juries does not extend beyond its interest in removing those jurors who would ‘frustrate the State’s legitimate interest in administering constitutional capital sentencing schemes by not following their oaths.’ Wainwright v. Witt, 469 U. S., at 423. To permit the exclusion for cause of other prospective jurors based on their views of the death penalty unnecessarily narrows the cross section of venire members. It ‘stack[s] the deck against the petitioner. To execute [such a] death sentence would deprive him of his life without due process of law.’ Witherspoon v. Illinois, 391 U. S., at 523.” Gray v, Mississippi, 481 U. S. 648, 658-659 (1987).
In its opinion, the Court blindly accepts the state court’s conclusory statement that Juror Z’s views would have “substantially impaired” his ability to follow the court’s instructions without examining what that term means in practice and under our precedents. Ante, at 16. Even AEDPA does not permit us to abdicate our judicial role in this fashion.
The high threshold that must be crossed to establish the kind of impairment that would justify the exclusion of a juror under the rule of Wainwright v. Witt is illustrated by Justice Powell’s opinion for the Court in Darden v. Wainwright, 477 U. S. 168 (1986). In that case, we assumed that a prospec *39 tive juror’s affirmative answer to the following question would not suffice to support his exclusion for cause: “ ‘Do you have any moral or religious, conscientious moral or religious principles in opposition to the death penalty so strong that you would be unable without violating your own principles to vote to recommend a death penalty regardless of the facts?’ ” Id., at 178. We recognized that the juror’s answer by itself did not compel the conclusion that he could not under any circumstances recommend the death penalty. See ibid. (“The precise wording of the question asked of [the juror], and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty”). We nevertheless upheld his exclusion because the trial judge had previously explained that he wanted to know if “ ‘you have such strong religious, moral or conscientious principles in opposition to the death penalty that you would be unwilling to vote to return an advisory sentence, recommending the death sentence even though the facts presented to you should be such as under the law would require that recommendationId., at 176 (emphasis added). Our holding in Darden rested squarely on the distinction between mere opposition to the death penalty — even when based on religious or moral principles — and an inability to perform the legally required duties of a juror.
In contrast, in Gray, 481 U. S. 648, we reversed a death sentence where a juror had been impermissibly struck for cause. In that case, the trial court struck a juror who appeared confused and who at times seemed to equivocate, but who eventually acknowledged that “she could consider the death penalty in an appropriate case.” Id., at 653; cf. voir dire testimony of Juror Z, App. 73 (“I could [impose the death penalty] if I was convinced that [it] was the appropriate measure”). The Court distinguishes Gray from the case now before us solely on the basis that in Gray there was no state-court finding of substantial impairment. Ante, at 9. In the Court’s view, this distinction is grounded in the *40 fact that, here, there was “an explicit ruling that Juror Z was impaired.” Ante, at 16. That “ruling” consists of a one-sentence conclusion included in the final summary section of the Washington Supreme Court’s opinion. That conclusion is based on an earlier part of the court’s opinion, in which it found that during voir dire, Juror Z “indicated that he would impose the death penalty where the defendant ‘would reviolate if released,’ which is not a correct statement of the law.” State v. Brown, 132 Wash. 2d 529, 604, 940 P. 2d 546, 585 (1997). Under our precedents, a juror’s statement that he would vote to impose a death sentence where , there is a possibility that the defendant may reoffend, provided merely as an example of when that penalty might be appropriate, does not constitute a basis for striking a juror for cause.[4]
In the alternative, and perhaps recognizing the tenuous nature of the state court’s “ruling,” the Court relies on the fact that the trial court’s judgment is entitled to deference because it had the unique opportunity to observe Juror Z’s demeanor during voir dire. A ruling cannot be taken at face value when it is clear that the reasoning behind that ruling is erroneous in light of our prior precedents.[5] There is abso *41 lutely nothing in the record to suggest — even in light of the trial court’s tendency to provide “careful and measured explanations” for its decisions, ante, at 11 — that anything about Juror Z’s demeanor would dull the impact of his numerous affirmative statements about his ability to impose the death penalty in any situation. In effect, the Court reads something into nothing and defers to a finding that the trial court never made, instead of relying on the finding on which the Washington Supreme Court clearly based its own ruling and which finds no support in our decisions.
In its analysis, the Court places great emphasis on defense counsel’s failure to object to Juror Z’s exclusion for cause, characterizing it as “voluntary acquiescence to, or confirmation of,” his removal. Ante, at 18. A closer look at the voir dire transcript, which the Court has included as an appendix to its opinion, reveals that the Court’s interpretation of defense counsel’s statement is not necessarily accurate. Upon being asked by the judge if either party had any challenge to Juror Z, the State provided that it did and the defense responded to the judge that it had “no objection.” App. 75. Although the Court reads defense counsel’s statement to mean that defense counsel had no objection to Juror Z’s exclusion, it is more clearly read to mean that the defense had no objection to Juror Z serving on the jury and therefore no reason to challenge him.[6] *6
*42 Even if we were to interpret defense counsel’s statement as the failure to provide an affirmative “defense of Juror Z,” ante, at 18, it is important to recognize that Washington law does not require an objection to preserve an error for review.[7] Ante, at 20; see also State v. Levy, 156 Wash. 2d 709, 719, 132 P. 3d 1076, 1081 (2006) (“We have long held that even if the defendant fails to object at trial, error may be raised on appeal if it ‘invades a fundamental right of the accused’ ” (quoting State v. Becker, 132 Wash. 2d 54, 64, 935 P. 2d 1321, 1326 (1997))).
In any event, whether defense counsel’s statement is taken as a failure to provide a defense of Juror Z or as acquiescence in his recusal, it is irrelevant to the ultimate disposition of this case. We said in Witt that the failure to object “in a situation later claimed to be so rife with ambiguity as to constitute constitutional error” is a factor that should be considered when assessing a defendant’s claims, 469 U. S., at 431, n. 11, but in this case there was absolutely no basis for striking Juror Z. Thus, counsel’s failure to provide an affirmative response to the State’s motion, though perhaps not strategically sound, does not doom respondent’s constitutional claim. Unlike Witt, in which there was arguably some ambiguity in the juror’s voir dire responses, here Juror Z had unambiguously asserted his full capability to follow the law. See, e. g., App. 58 (“I do believe in the death penalty in severe situations”); id., at 62 (responding to whether he could consider both available sentencing options, “Yes, I could”); id., at 63 (“I just felt that there were times when [the death penalty] would be appropriate”); id., at 72 (responding to whether he could consider and impose the death penalty where the defendant would otherwise never be released from prison, “Yes, sir”); id., at 73 (responding to whether he could *43 consider and vote for the death penalty where the alternative is a life sentence without the possibility of parole, “I could [impose it] if I was convinced that was the appropriate measure”); cf. Witt, 469 U. S., at 438 (Stevens, J., concurring in judgment) (“Given ... [the juror’s] somewhat timorous responses, it is entirely possible that her appearance and demeanor persuaded trial counsel that he would prefer a more vigorous or less reluctant juror”).
II
Even a juror who is generally opposed to the death penalty cannot permissibly be excused for cause so long as he can still follow the law as properly instructed. The Court recognizes this principle, see ante, at 5-6, and yet the perverse result of its opinion is that a juror who is clearly willing to impose the death penalty, but considers the severity of that decision carefully enough to recognize that there are certain circumstances under which it is not appropriate (e. g., that it would only be appropriate in “severe situations,” App. 63), is “substantially impaired.” It is difficult to imagine, under such a standard, a juror who would not be considered so impaired, unless he delivered only perfectly unequivocal answers during the unfamiliar and often confusing legal process of voir dire and was willing to state without hesitation that he would be able to vote for a death sentence under any imaginable circumstance. Cf. Adams v. Texas, 448 U. S. 38, 50-51 (1980) (“We repeat that the State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths. But [the Constitution does not allow the exclusion of] jurors whose only fault was to take their responsibilities with special seriousness or to acknowledge honestly that they might or might not be affected”).
Today, the Court has fundamentally redefined — or maybe just misunderstood — the meaning of “substantially impaired,” and, in doing so, has gotten it horribly backwards. *44 It appears to be under the impression that trial courts should be encouraging the inclusion of jurors who will impose the death penalty rather than only ensuring the exclusion of those who say that, in all circumstances, they cannot. The Court emphasizes that “the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes.” Ante, at 9. But that does not and cannot mean that jurors must be willing to impose a death sentence in every situation in which a defendant is eligible for that sanction. That is exactly the outcome we aimed to protect against in developing the standard that, contrary to the Court’s apparent temporary lapse, still governs today. See Gray, 481 U. S., at 658 (explaining that to permit the exclusion of jurors other than those who will not follow their oaths “unnecessarily narrows the cross section of venire members” and “ ‘stack[s] the deck against the petitioner’” (quoting Witherspoon, 391 U. S., at 523)).
Judge Kozinski’s opinion for the Court of Appeals in this case is solidly grounded on the entire line of our cases recognizing the basic distinction dramatically illustrated by Justice Powell’s opinion in Darden and by Justice Rehnquist’s statement in Lockhart. He surely was entitled to assume that the law had not changed so dramatically in the years following his service as a law clerk to Chief Justice Burger that a majority of the present Court would not even mention that basic distinction, and would uphold the disqualification of a juror whose only failing was to harbor some slight reservation in imposing the most severe of sanctions.
I respectfully dissent.

 The Court opens its opinion with a graphic description of the underlying facts of respondent’s crime, perhaps in an attempt to startle the reader or muster moral support for its decision. Given the legal question at issue, and the procedural posture of this case, the inclusion of such a de *36 scription is, in my view, both irrelevant and unnecessary. Cf. Witt, 469 U. S., at 440, n. 1 (Brennan, J., dissenting) (“However heinous Witt’s crime, the majority’s vivid portrait of its gruesome details has no bearing on the issue before us. It is not for this Court to decide whether Witt deserves to die. That decision must first be made by a jury of his peers, so long as the jury is impartial and drawn from a fair cross section of the community in conformity with the requirements of the Sixth and Fourteenth Amendments”).

 In contrast to Juror Z’s statements, those jurors who have been properly struck under the Witherspoon-Witt rule have made much stronger statements with regard to their inability to follow the law or to impose the death penalty. See, e. g., Wainwright v. Witt, 469 U. S. 412, 416 (1985) (juror confirming that her personal beliefs would interfere with her ability to judge the guilt or innocence of the defendant); id., at 438, n. 7 (Stevens, J., concurring in judgment) (discussing the two other jurors who were properly dismissed for cause, one of whom stated that he would not be able to ‘“follow the law as instructed by the Court’” when the death penalty was in issue, and the other of whom stated that he could not “keep an open mind as to whether to vote for the death penalty or life”); Witherspoon v. Illinois, 391 U. S. 510 (1968). Cf. Gray v. Mississippi, 481 U. S. 648, 653-654, and n. 5, 659 (1987) (holding that a juror who seemed “some *37 what confused” but who stated that she “could” vote for the death penalty “'was clearly qualified to be seated as a juror under the Adams [v. Texas, 448 U. S. 38 (1980),] and Witt criteria’”).

 “The state of this case law leaves trial courts with the difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial.” Witt, 469 U. S., at 421.

 To the extent the Washington Supreme Court deemed Juror Z “substantially impaired” because he initially demonstrated a misunderstanding of or confusion about the relevant law, that would also be an insufficient basis to support his exclusion for cause, given that by the end of the voir dire questioning, his confusion on that point had abated and he had made clear that even if the defendant were never to be released, he could still consider the death penalty. He also initially “misunderstood the State’s burden of proof in a criminal case” but, as the Washington Supreme Court itself explained, “he was corrected later.” 132 Wash. 2d, at 604, 940 P. 2d, at 585.

 Although pre-AEDPA, we recognized in Gray that the deference traditionally given to a trial courts findings may not be due when those findings are based on a misapplication of federal law. See 481 U. S., at 661, n. 10 (“The State has devoted a significant portion of its brief to an argument based on the deference this Court owes to findings of fact made by a trial court. Such deference is inappropriate where, as here, the trial *41 court’s findings are dependent on an apparent misapplication of federal law”).

 As the Court of Appeals recognized in its opinion, it could also certainly be the case that “defense counsel declined to object because he was glad to get rid of juror Z[, given that] Z had described himself as pro-death penalty, and reiterated numerous tiroes, under oath, that he would be willing and able to impose the death penalty.” Brown v. Lambert, 451 F. 3d 946, 953, n. 9 (CA9 2006); cf. Witt, 469 U. S., at 437 (Stevens, J., concurring in judgment) (noting that in the case of one juror who stated unequivocally that she “‘could not bring back a death penalty,”’ the defense’s objection to the prosecutor’s motion to excuse her for cause served to demonstrate that defense counsel wanted the juror to remain on the jury).

 In contrast, in Witt, we found it significant enough to note that since it had decided the case, the Florida Supreme Court had “enforced a contemporaneous-objection ride when dealing with Witherspoon challenges.” Id., at 431, n. 11.